WO

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

Keith P. Nance,

               Plaintiff,

   v.

Allen Miser, et al.

              Defendants.

No. CV 12-00734-PHX-RCB

**FINAL PRETRIAL ORDER**

Defendants, through undersigned counsel, have repeatedly exchanged drafts of a Joint Proposed Pretrial Order with Plaintiff Keith Nance, including e-mailed versions over the January 24-25, 2014 weekend.  Although all of Nance's proposals have been incorporated into the following document, he has refused to execute this final version, as indicated in the attached e-mail exchanges between undersigned counsel and Arizona Department of Corrections Staff ("Exhibits A & B").  Accordingly, Defendants submit this Joint Proposed Pretrial Order unilaterally.

This Final Pretrial Order supersedes the pleadings and shall govern the trial and further proceedings in this case.

**A.  STATE OF JURISDICTION.**

This Court has jurisdiction over this action pursuant to 42 U.S.C. § 1983.

**B.  NATURE OF ACTION.**

This is a civil rights action pursuant to 42 U.S.C. § 1983.  The Plaintiff seeks compensatory damages, punitive damages, and injunctive relief from this Court against

1    named Defendants Miser, Vicklund, Linderman, and Patton due to violations of clearly

2    established statutory and constitutional law.   Defendants' denial of a Halal Religious

3    Meat Diet and denial of a religious shaving waiver for seven months cause the Plaintiff a

4    substantial burden upon in exercise of sincerely held religious beliefs.

5    **C.    CONTENTIONS OF THE PARTIES.**

6         **Plaintiff**:

7         In Count I of his First Amended Complaint, the Plaintiff alleges that Defendants

8    denied him a Halal meat diet and religious shaving waiver for seven months in violation

9    of his religious exercise.   The Plaintiff alleges also the absence of a compelling or

10   penological reason which justifies denial of a Halal meat diet and shaving waiver.   The

11   Plaintiff alleges that as a Muslim he's been discriminated against while adherents of

12   other faiths are provided religious diets consistent with their sincerely held beliefs.

13        **1.    Claim of Violation of Free Exercise of Religion:**

14        The Plaintiff retains the protections afforded by the First Amendment, including

15   its directive that no law shall prohibit the free exercise of religion." *Shakur v. Schriro*,

16   514 F.3d 878, 883-84 (9th Cir. 2008) (Quoting *O'Lone v. Estate of Shabazz*, 482 U.S.

17   342, 348 (1987).  To implicate the Free Exercise Clause, the Plaintiff must show that the

18   belief at issue is both "sincerely held" and "rooted in religion" or religious belief.  *Malik*

19   *v. Brown*, 16 F.3de 33, 333 (9th Cir. 1994); see *Shakur*, 514 F.3d 884-85 (noting the

20   Supreme Court's disapproval of the centrality test and finding that the sincerity test in

21   *Malik* determines whether the Free Exercise Clause applies.)

22        If the Plaintiff makes his initial showing, he must establish that prison officials

23   substantially burden the practice of his religion by preventing him from engaging in

24   conduct which he sincerely believes is consistent with his faith.  *Shakur* 514 F.3d at 884-

25   85.

26

27

28
                                            2

1    A regulation that burdens the First Amendment right to free exercise may be

2    upheld only if it is reasonably related to a legitimate penological interest.  *Turner v.*

3    *Safley*, 482 U.S. 78, 89 (1987).

4    Under RLUIPA, a government may not impose a substantial burden on the

5    religious exercise of a confined person unless the government establishes that the burden

6    furthers "a compelling governmental interest" and does so by "the least restrictive

7    means."  42 U.S.C. § 2000 cc-1(A)(1)(2).  RLUIPA must be construed broadly in favor

8    of protecting the Plaintiff's right to exercise his religious beliefs.

9    The Plaintiff bears the burden of establishing prima facie that RLUIPA has been

10   violated and that his religious exercise has been substantially burdened.  *War Soldier*,

11   418 F.3d at 994 (citing 42 U.S.C. § 2000 cc-2(b)).  The government then bears the

12   burden of proving that the substantial burden on the Plaintiff 's religious practice both

13   furthers a compelling governmental interest and is the least restrictive means of doing so.

14   *Id*. at 995 (citing 42 U.S. C. §§ 2000 cc-1(A), 2000 cc-2(b)**.**

15   **Defendants:**

16   Defendants assert that they do not violate Nance's First Amendment rights, nor do

17   they prohibit him from freely exercising his religion as an incarcerated felon.

18   Defendants and the Arizona Department of Corrections ("ADC") offer pork-free diets,

19   and have approved Nance's shaving waiver.

20   The record shows Nance first requested a shaving waiver years after his

21   incarceration and identification as a Muslim.  First incarcerated in 2002, he identified

22   himself as a Muslim at that time, but did not apply for a shaving waiver until 2005—at

23   which time he requested and received a permanent *medical* shaving waiver.  He then

24   requested and was granted a *religious* shaving waiver on February 9, 2006.  Nance was

25   subsequently released from prison but was re-incarcerated on September 15, 2010.

26   Although he initially failed to articulate a religious reason for his shaving waiver upon

27

28

3

his return to ADC custody, he subsequently provided a religious reason and was granted a religious shaving waiver on June 16, 2011.

### a.    No First Amendment Violations

A state regulation or practice "does not violate the Establishment Clause if (1) the enactment has a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not foster an excessive entanglement with religion." *Collins v. Chandler Unified Sch. Dist.*, 644 F.2d 759, 762 (9th Cir.) (citing *Lemon v. Kurtman*, 403 U.S. 602 (1971)), *cert. denied*, 454 U.S. 863 (1981).  Entanglement may also be treated as an aspect of the inquiry into a statute's effect.  *See Agostini v. Felton*, 521 U.S. 203, 233-34 (1997) (federally funded program allowing remedial instruction on premises of sectarian schools does not have effect of advancing religion where it does not result in governmental indoctrination, define its recipients by reference to religion, or create an excessive entanglement).  Under the *Lemon* test with the *Agostini* refinement, the inquiry under the second prong is (a) "'whether the government acted with the purpose of advancing or inhibiting religion,'" and (b) "'whether the [governmental] aid has the "effect" of advancing or inhibiting religion.'"  *Community Housing, Inc. v. City of Boise*, 490 F.3d 1041, 1055 (9th Cir. 2007) (quoting *Agostini*, 521 U.S. at 222-23).

Here, Nance fails to show a triable issue of fact that the ADC's religious diet program violated the Establishment Clause.  As in *Curry*, ADC's religious diet program offers several diets for the permissible secular purpose of facilitating religious practice within prison and not for the purpose of a advancing a particular religion.  The primary effect of the ADC's religious diet program neither advances nor inhibits religious practice, and it does not foster an excessive entanglement with religion.

The Supreme Court has held that government efforts to accommodate religion are permissible when they simply remove burdens on the free exercise of religion.  *Corp. of Presiding Bishops of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327,

4

348 (1987).   Here, the ADC's religious diet program is an effort to accommodate religion which removes burdens on the free exercise of religion.   The religious diet program offers pork-free kosher and vegetarian meal options that sustain Nance in good health and satisfy the dietary laws of his religion.  *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987).

Additionally, Nance suffered no First Amendment violation by experiencing a delay in approval for his shaving waiver.  Although he had declared his Muslim religious preference in 2002, he did not request a shaving waiver for several years.  Once he requested a shaving waiver, he failed to articulate a religious reason for it.  Accordingly, Defendants did not approve his requested waiver until such time as he could articulate a religious reason for requesting the shaving waiver.   The administrative regulation requiring inmates to articulate a religious reason for requesting a shaving waiver represents the least restrictive means by which to enforce the compelling government interest in maintaining a secure and safe prison environment, while facilitating legitimate religious practice, materials and supplies.

### *Turner v. Safley,* 482 U.S. 78 (1987)

#### 1. *Valid, rational connection between prison regulation and legitimate government interest*

Defendants contend that the ADC religious diet policy, which does not provide for halal meat, is validly and rationally connected to the legitimate state interests of prison budget and administrative concerns.  Further, the administrative requirement that an inmate articulate a religious reason for a shaving waiver is rationally connected to the legitimate state interests of maintaining a secure and safe environment.

#### 2. *Alternative means of practicing his religion available*

Defendants further submit that Nance has alternative methods of practicing his religion available to him.  "The relevant inquiry under this factor is not whether the

1  inmate has an alternative means of engaging in the particular religious practice that he or

2  she claims is being affected; rather, [the Court is] to determine whether the inmates have

3  been denied all means of religious expression." *Ward v. Walsh*, 1 F.3d 873, *citing*

4  *O'Lone v. Shabazz*, 482 U.S. 342, 351-52 (1987).  It is relevant to note that, in evaluating

5  the second *Turner* factor, the Court should distinguish "between a religious practice

6  which is a positive expression of belief and a religious commandment which the believer

7  may not violate at peril of his soul." *Ward*, 1 F.3d at 877 n. 1.

8        Nance is able to request and receive alternative pork-free diets available to him

9  through ADC's religious diet program.  Defendants and their witnesses will confirm that,

10  as long as Nance is not forced to eat pork, any other non-meat diet can be construed as

11  conforming to Halal standards.  In fact, Nance requested and accepted these pork-free

12  alternatives for years.  Though Nance now desires to eat meat, and have that meat

13  prepared consistent with halal practice, he cannot demonstrate that this preference is

14  more than a positive expression of belief.  There is no evidence that Nance's belief that

15  he needs to eat meat is a religious commandment, or that eating a vegetarian or pork-free

16  kosher diet imperils his soul.

17        Additionally, Nance is entitled to purchase and use a variety of religious materials

18  and supplies, including a prayer rug, Dikhr (prayer) beads, a Kufi (brimless, short,

19  rounded cap worn by men in many Western African and Asian cultures), a Miswak (a

20  teeth cleaning twig made from the Salvadora persica tree—known as *arak* in Arabic), an

21  offering bowl, and prayer oil, and the Qu'aran and other Islamic religious texts.

22        Nance has the opportunity to participate in restricted religious diets, daily prayers,

23  weekly Jumah (group worship), monthly pastoral visits from the religious leader of his

24  choice (provided that person is willing to come and is cleared by ADC), and have special

25  arrangements made during the month-long observation of Ramadan, a period of fasting

26  and prayer, to allow him to take his meals at the religiously prescribed times.

27

28

### 3. Significant Impact Accommodation Will Have on Guards, Inmates and General Allocation of Prison Resources

Requiring Defendants and the ADC to provide Halal meat to inmates would have a significant impact on correctional officers, inmates and prison resources.  Defendants and ADC, through competitive bidding processes, contract with private entities to provide meals.  Currently, ADC's meals are provided through Trinity Services Group, Inc., (www.trinityservicesgroup.com) which does not offer Halal meat or meals.  Although it is possible that Trinity or some other provider might be able to procure and provide Halal meat to Nance or other inmates, the cost will be prohibitive.  There would be a significant disruption of culinary services if Defendants and the ADC were required to provide a special meal for one prisoner.  Defendants and witnesses from Trinity will testify about the burdensome amount of time, money, and resources that would be required to accommodate Halal meat diets to inmates—particularly given that many Muslims request and prefer other pork-free religious diets.

### 4. No Ready Alternatives to ADC's Current Policy

The fourth *Turner* factor weighing in favor of Defendants is the fact that there are not ready alternatives to ADC's current religious diet program.  Inmates cannot be granted *a la carte* menus to demand Halal meat, as the cost of administrating such a system would explode.  ADC and Defendants must purchase and prepare food in bulk quantities, to maintain a manageable cost and bidding structure.  If the ADC was compelled to provide Halal meat, other religious groups will request shrimp, lobster, and other specialized diet delicacies, claiming omission of those items violates their First Amendment rights.

7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### b.     No RLUIPA Violations

Defendants and ADC policy do not impose substantial burdens on Nance's exercise of religion.  Even if a substantial burden is found, their policy of not providing halal meat is the least restrictive means of pursuing compelling government interests of efficiency and cost-effectiveness.

Defendants contend that any burden to Nance's religious practice by denial of halal meat is *de minimis*, as consumption of meat is not required.  Further, any such burden is the least restrictive means of furthering the compelling government interest of saving costs, as halal meat is unreasonably expensive to procure and provide to inmates.

### 2.     Equal Protection.

**Plaintiff:**

The Equal Protection Clause requires that persons who are similarly situated be treated alike.  *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985); *Shakur*, 514 F.3de 891.  An equal protection claim may be established by showing that prison officials intentionally discriminated against the Plaintiff based on his membership in a protected class, *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 702-03 (9th Cir. 2009); *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003); *Lee v. City of L.A.*, 250 F.3d 668, 686 (9th Cir. 2001), or that similarly situated individuals were intentionally treated differently without a rational relationship to a legitimate state purpose, *Enquist v. Or. Dept. of Agric.*, 553 Y.S. 591, 601-02 (2008); *Vill of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Lnzy Y Ranch Ltd. V. Behrens*, 546 F.3d 580, 592 (9th Cir. 2008).

In addition the Plaintiff "must set forth specific facts showing that there is a genuine issue as to whether he was afforded a reasonable opportunity to pursue his faith as compared to prisoners of other faiths and officials intentionally acted in a

8

1    discriminatory manner.   *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997).

2    Abrogated on other ground by *Shakur*, 514 F.3d at 884-8.

3        **Defendants:**

4        Defendants contend that inmates need not be offered identical opportunities to

5    exercise their religions.   "The Equal Protection Clause of the Fourteenth Amendment

6    commands that no State shall 'deny to any person within its jurisdiction the equal

7    protection of the laws,' which is essentially a direction that all persons similarly situated

8    should be treated alike.   *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439

9    (1985).   In the prison context, the Equal Protection Clause requires that an inmate who is

10   an adherent of a minority religion be afforded a "reasonable opportunity of pursuing his

11   faith comparable to the opportunity afforded fellow prisoners who adhere to

12   conventional religious precepts," *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (Buddhist

13   prisoners must be given opportunity to pursue faith comparable to that given Christian

14   prisoners), as long as the inmate's religious needs are balanced against the reasonable

15   penological goals of the prison, *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987).

16   *Allen v. Toombs*, 827 F.2d 563, 568-69 (9th Cir. 1987).   A prisoner cannot prevail on his

17   equal protection claim "if the difference between the defendants' treatment of him and

18   their treatment of [other] inmates is 'reasonably related to legitimate penological

19   interests.'"   *Shakur*, 514 F.3d at 891 (9th Cir. 2008 (citations omitted).

20       Nance is provided a variety of reasonable opportunities to pursue his faith,

21   comparable to opportunities afforded adherents of other faiths, as indicated *infra.* at 5-6.

22   As in *Curry*, Nance fails to show a triable issue of fact in support of his equal protection

23   claim.   He points out that Jewish inmates were able to obtain diets consistent with their

24   faith, but that alone is not enough to show an equal protection violation.   *Curry*, slip op.

25   at 7.   Prisons need not provide identical facilities or services to different faiths, but must

26   make good faith accommodation of the prisoners' rights in light of practical

27

28
                                         9

considerations.  *See Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997), *overruled on other grounds as stated in Shakur*, 514 F.3d at 884-85.   Here, Nance received Defendants' good faith accommodation of his rights by access to the kosher and vegetarian options.   He rejected these options.   His rejection of the good faith accommodations is insufficient to rise to the level of an Equal Protection violation.  Because Nance fails to raise an issue of material fact regarding the ADC's good faith accommodation, Defendants are entitled to summary judgment regarding Nance's Equal Protection claim.

### 3.  Claim of Constitutional and Statutory Rights of the Plaintiff.

**Plaintiff:**

The Plaintiff must show that Defendants actions violated clearly established constitutional and statutory law.   The Plaintiff must show Defendants had a policy, practice, or custom that violated the Plaintiff's rights and that the policy, practice, or custom was the moving force behind the violation.  See *Mabe*, 237 F.3d at 11-11.

**Defendants:**

Defendants are entitled to qualified immunity against the First and Fourteenth Amendment claims with regard to Nance's religious diet because there is no precedent that correctional facilities must provide Halal meat to inmates under federal judicial decisions or statutes.   The defense of qualified government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   To determine whether an official is entitled to qualified immunity, the Court must decide whether the facts alleged show the official's conduct violated a constitutional right; and if so, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  *Saucier v. Katz*, 533 U.S. 194, 201-09 (2001).   "[I]f no constitutional right would have been

violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

Although the Court has recognized that Nance has stated a claim for relief under the First and Fourteenth Amendments regarding his religious practice claims, there is no constitutional right to meat, much less Halal meat. This is the substance of Nance's complaint, and there is no evidence that any Defendant should know or be aware of any such constitutional right. Nance has the "right to be provided with food sufficient to sustain [him] in good health that satisfies the dietary laws of [his] religion," *Ward v. Walsh*, 1 F3.d 873, 877 (9th Cir. 1993) (*quoting McElyea v. Babbitt*, 883 F.2d 196, 198 (9th Cir. 1987)) but there is simply no judicial or statutory precedent that any Defendant should have been aware of indicating that ADC's religious diet program—which provides pork-free options to Jewish and Muslim inmates alike, is insufficient to satisfy Muslim dietary needs.

This Court should find that, as in *Curry,* "the failure to accommodate [Nance's] particular dietary needs did not violate clearly established law." No. C-09-3408, 2013 WL 75769, *17. There is simply no clearly established statutory or constitutional right to Halal meat. Historically Muslims had accepted, and even requested—as in the case of *Shakur*—vegetarian and kosher diets because they provided pork-free meals consistent with Halal practice. Additionally, Muslim diets have been, and continue to be, satisfied by vegetarian diets. None of the Defendants believed that offering Nance the vegetarian diet was legally deficient. Because he was not compelled to eat pork, which is forbidden, Nance was not forced to violate a commandment "at peril of his soul." Accordingly, they are entitled to qualified immunity to Nance's First and Fourteenth Amendment claims regarding the religious diet request.

1        **Relief**

2               In his First Amended Complaint's "Request for Relief" section, Nance seeks: 1)

3       "a declaration that acts of omission and commission described violated Plaintiff['s]

4       rights, 2) a permanent injunction ordering officials to provide a Halal diet and Islamic

5       Representation, hiring of a Imam as chaplain, 3) compensatory damages of $75,000.00

6       dollars per Defendant, jointly and severally, 4) punitive damages in the amount of

7       $75,000.00 against each Defendants, jointly and severally, 5) trial by jury on all issues

8       triable by jury, 6) any and all costs associated with the filing and litigation of this

9       complaint, 7) appointment of counsel for representation due to complexity of

10      constitutional laws involved."  (Doc. 9.)

11             Defendants contend that, under RLUIPA, the only remedy available to Nance is

12      only is injunctive relief.  Defendants further contend that they are entitled to qualified

13      immunity, as discussed *infra.* at 10-11, for any liability arising out of Nance's

14      constitutional claims.

15          **4.      Qualified Immunity.**

16          **Plaintiff:**

17             The Plaintiff asserts he was initially denied a shaving waiver for the first seven

18      months after his request for a Halal religious meat diet and shaving waiver.  Defendants

19      did not dispute Plaintiff's assertions that he was denied the diet and waiver based on his

20      re-incarceration which was deemed evidence of lack of a sincere belief.   May 25, 2011,

21      the Director approved the diet and shaving waiver.  The Plaintiff refused a kosher and

22      vegetarian diet but signed for the shaving waiver on June 16, 2011.  Defendants failed to

23      make an argument of any kind as to qualified immunity for that period and again no

24      argument on reconsideration.  Defendants cite no cases specifically discussing qualified

25      immunity in religious diet cases.  For purposes of qualified immunity determination, "the

26      right allegedly violated must be defined at the appropriate level of specificity before a

27

28                                                     12

1    court can determine if it was clearly established.  *Wilson v. Layne*, 526 U.S. 603, 615

2    (1999); see *Dun v. Castro*, 623 F.3d 1196, 1200 (9th Cir. 2010) (When deciding whether

3    there has been a violation of a clearly established right for qualified immunity, a court

4    must strike the proper balance in defining that right.)"  A right is clearly established if its

5    contours are "sufficiently clear that a reasonable official would understand that what he

6    is doing violates that right."  *Kennedy v. City of Ridgefield*, 439 F.3d 1044, 1065 (9th

7    Cir. 2006) (Quoting *Hope v. Pelzer*, 536 U.S. 730, 730 (2002).  It is not necessary that

8    there is a prior case with identical facts showing that a right is clearly established:  It is

9    enough that there is preexisting law that provides Defendants fair warning that his

10   conduct was unlawful.  *Kennedy*, 439 F.3d at 1065.

11          There is a clearly established right to a religious diet that meets the Plaintiff's

12   religious dietary needs unless there is a legitimate penological reason to deny it.  It is

13   clearly established that sincerely held religious beliefs are entitled to protection whether

14   or not prison officials deem them central or valid tenets of the Plaintiff's faith.

15   Defendants failed to address the Plaintiff's sincerely held beliefs.  Defendants did not

16   address even cursorily, the *Turner* factors.

17          **Defendants:**

18          See Section C, subsection 3, *infra.*

19   **D.      STIPULATION AND UNCONTESTED FACTS.**

20          1.      Plaintiff Keith P. Nance, (hereinafter "Nance"), is an inmate in the custody

21   of the Arizona Department of Corrections ("ADC"), serving a sentence for dangerous

22   kidnapping and domestic violence with a maximum end date of November 26, 2035;

23          2.      Defendant Michael Linderman ("Linderman") is appointed by Defendant

24   ADC Director Charles Ryan ("Ryan") and employed by the ADC as Administrator of

25   Pastoral Activities;

26

27

28                                                 13

3.     Linderman has been employed with the ADC for 23 years, 18 of which has been in his current position;

4.     Linderman is aware of the religious issues contained in Nance's written communications between Nance and the ADC regarding religious issues;

5.     Nance alleges that he is a practicing Muslim since 1986;

6.     Between 2002 and 2008, he served seven (7) years with the Arizona Department of Corrections (ADC) for Attempted Sexual Conduct with a Minor;

7.     During this term of incarceration he was provided a pork-free kosher or pork-free vegetarian religious diet and a medical shaving waiver, though he did not receive a Halal diet;

8.     In September, 2010 Nance was re-committed to the custody of ADC, this time to serve a twenty (20) year sentence for Kidnapping and Domestic Violence;

9.     Shortly after his return to ADC, Nance requested a religious diet and shaving waiver on religious grounds.  In the course of re-applying for his shaving waiver and pork-free religious diet request, Defendants disputed whether he could identify a sincere religious reason for requesting a specialized diet, but ultimately approved his shaving waiver and offered him vegetarian or kosher diet on June 16, 2011;

10.     Nance accepted the shaving waiver but rejected the kosher or vegetarian diet, stating he wanted a Halal diet;

11.     On August 5, 2011, Nance was informed by Deputy Director Patton, after consultation with Linderman, that if he did not wish to be on the pork-free kosher diet he could request movement to a vegetarian diet, which ADC considers proper under Halal standards;

12.     Nance rejected the pork-free vegetarian diet and is currently not on any religious or special diet;

13.   ADC religious services program offers a variety of methods for inmates to practice their chosen religion, including registration as a member of a religion, participation in religious gatherings, purchase and possession of otherwise restricted religious personal property, receipt of religious diet, and other religious privileges;

14.   The ADC's religious diet program offers several diets for the secular purpose of facilitating religious practice within prison without advancing a particular religion;

15.   ADC does not offer a Halal diet but rather provides a pork-free kosher or pork-free vegetarian diet for qualifying Muslim inmates;

16.   For more than 20 years, the ADC has accommodated Muslim dietary requests by providing the option of a pork free diet;

17.   At no time has Nance or any other member of the Muslim or legal communities indicated Muslims are required to eat meat;

18.   If a Muslim does choose to eat meat, it is considered *haram* (or forbidden) to consume pork;

19.   Nearly 10 years ago, the ADC added a pork-free vegetarian option for Muslims because the vegetarian diet meets Islamic standards by avoiding meat that has not been properly blessed and slaughtered;

20.   ADC is currently instituting a new vegetarian diet program that has been certified by both Jewish (kosher) and Islamic (Halal) representatives;

21.   The ADC's new religious diet program offers a vegetarian diet that is not tethered to any particular religion and is available to accommodate a variety of religious beliefs; and

22.   The primary effect of the ADC's religious diet program neither advances nor inhibits religious practice.

15

**E.      CONTESTED ISSUES OF FACT AND LAW.**

   **Plaintiff;**

   1.     Whether [on] October 31, 2010, the Plaintiff was interviewed by Allen Miser to establish his sincerely held religious beliefs of Islam.

   2.     Whether [on] October 31, 2010, Allen Miser questioned the Plaintiff: "How as a Muslim can you be convicted of child molestation?"

   3.     Whether [on] October 31, 2010, the Plaintiff denied conviction of child molestation responding to Allen Miser "What did a conviction have in relationship to sincerely held religious beliefs?".

   4.     Whether [on] December 2, 2010, the Plaintiff received a response from Allen Miser stating:  "Based upon an interview this office cannot currently identify a sincere religious reason for your request that is consistent with your religious preference. If you can provide further information to establish a sincere religious reason for your request it will be reviewed again."

   5.     December 10, 2010, whether Plaintiff submitted a formal grievance.

   6.     Whether [on] February 24, 2011, Assistant Deputy Warden Faye response reads:  "Chaplain Miser advised he interviewed you and based upon that interview your request was denied.  This due to 'them' not being able to identify a sincere religious reason for your request consistent with your religious preference."   Chaplain Miser advised:  "He did not know exactly what the sincerity problem was but that he believed that because you were released and came back on a new charge," he states:  "This shows that you were not consistent in practicing your faith."

   7.     Whether Jewish inmates currently have kosher meat diets, vegans receive their vegan diet and other adherents according to their religious beliefs.

8.      Whether Plaintiff experienced deprivations and constraints upon religious exercise and expression that manifest a central tenet of Islam and compels conduct contrary to the Plaintiff's sincerely held beliefs.

9.      Whether officials['] decisions forced the Plaintiff to defile himself with unlawful foods or starve?

10.     Whether officials['] decisions were punitive and discriminatory.

11.     Whether [on] May 25, 2011, Director Charles Ryan upheld the Plaintiff's inmate grievance authorizing a religious diet and shaving waiver.  (A37-119-0100.)

12.     Whether [on] October 31, 2010, the Plaintiff forwarded an inmate letter to Senior Chaplain Vicklund regarding Allen Miser's questions to Plaintiff during an interview October 31, 2010.

13.     Whether [on] December 8, 2010, the Plaintiff began a grievance due to not receiving a response from James Vicklund, Allen Miser's Supervisor.

14.     Whether [on] December 24, 2010, the Plaintiff advanced his formal grievance due to no resolution from December 8, 2010.   (Officials never assigned Plaintiff a case number.)

15.     Whether [on] January 13, 2011, the Plaintiff advanced his grievance appeal due to no resolution from December 24, 2010.  (Officials never assigned Plaintiff a case number.)

16.     Whether [on] February 4, 2011, the Plaintiff advanced his final grievance to Director Ryan due to no resolution from January 13, 2011.  (Officials never assigned Plaintiff a case number.)

17.     Whether the Plaintiff ever received a response to any of the submitted grievances to Officials regarding Allen Miser's questions on October 31, 2010.

18.     Whether [on] January 11, 2011, the Plaintiff forwarded an inmate letter to James Vicklund:  "How does A.D.C. establish Islamic policy?"

19.     Whether [on] February 17, 2011, the Plaintiff submitted an inmate letter to James Vicklund for denial of Halal Religious Meat Diet and shaving waiver.  (A37-119-110.)

20.     Whether [on] February 23, 2011, a response from James Vicklund states: "The content of your letter concerns a grievance.  Grievances are to be processed through your grievance coordinator."

21.     Whether James Vicklund personally participated in violations or had a causal connection with decisions which created substantial burdens upon the Plaintiff's exercise of religion.  (A37-119-010.)

22.     Whether Mike Linderman personally participated in violations or had a casual connection with decisions which created substantial burdens upon the Plaintiff's exercise of religion.  (A37-119-010.)

23.     Whether Allen Miser personally participated in violations or had a casual connection with decisions which created substantial burdens upon the Plaintiff's exercise of religion.  (A37-119-010.)

24.     Whether Robert Patton personally participated in violations or had a casual connection with decisions which created substantial burdens upon the Plaintiff's exercise of religion.  (A37-119-010.)

25.     Whether [on] February 25, 2011, the Plaintiff forwarded an inmate letter to Mike Linderman regarding Islamic representation/

26.     Whether [on] March 25, 1011, the Plaintiff received a response from Mike Linderman stating:    "There is a process by which you can have your concern's addressed.  Please follow the process."

27.     Whether [on] June 21, 2011, the Plaintiff forwarded an inmate letter to Mike Linderman in response to Grievance A12-119-010 Halal Religious Meat Diet for

18

1   not receiving his religious diet and shaving waiver upheld by Director Ryan on May 25,

2   2011.

3         28.    Whether [on] July 7, 2011, Robert Patton responded on behalf of Director

4   Charles Ryan stating:   "You indicate your grievance A12-119-010 is unresolved.

5   Pursuant to D.O. 802.1.8 the decision of the Director is final and constitutes exhaustion

6   of all remedies within the Department.   You have been approved for a religious diet as

7   indicated in your inmate letter when Chaplain Miser met with you on 6/16/11 and gave

8   you the opportunity to receive a kosher diet.   You did sign for the kosher diet.   This

9   should not burden your religious exercise to serve you the diet you requested."

10         29.    Whether [on] July 13, 2011, the Plaintiff forwarded an inmate letter to

11   Robert Patton stating:  "I never signed for a kosher diet due to a religious ruling which

12   prohibits the Plaintiff from a kosher diet, including enclosed copy of the religious ruling

13   for review.

14         30.    Whether [on] August 5, 2011, Robert Patton responded to the Plaintiff

15   stating: "You requested a religious diet without further specificity.  If you don't wish the

16   kosher diet, you may request a vegetarian diet."

17         31.    Whether the Plaintiff exhausted the Inmate Grievance Policy 802 regarding

18   a Halal religious meat diet and shaving waiver.  (May 25, 2011.)

19         32.    Whether the Plaintiff was afford the process which is constitutionally due

20   him.

21         33.    Whether the Plaintiff forwarded an inmate letter dated 9/25/13 to Allen

22   Miser regarding the proposed Halal/Kosher Certified Vegetarian Diet.   Notification

23   Number 20-13.  Questioning who certified this diet from the Islamic community.

24         34.    Whether the Plaintiff forwarded an inmate letter dated 9/25/13 to Mike

25   Linderman regarding the proposed Halal/Kosher Certified Vegetarian Diet Notification

26   Number 20-13, questioning who certified this diet from the Islamic community.

27

28

35.     Whether October 15, 2013, Mike Linderman response states:  "This office has been asked to respond on behalf of the Director to your letter dated 9/25/13 and received on 10/1/13.  In this letter, you inquire about a Kosher/Halal vegetarian diet and that diet's certification.  You have also sent the same letter to this office so this response addresses both letters.

The menu change you reference has been postponed and therefore there is no reason to pursue this issue further at this time.  However you should be aware that the ADC contracts with a vendor for food service and any certification of foods is pursued by the vendor, not the ADC.  This office cannot provide you with information about the vendor's certification process or sources."

36.     Whether the Plaintiff submitted an informal complaint resolution dated 10/21/13 to CO III Legate regarding the Kosher/Halal Vegetarian Certified Diet. (Number 20-13.)

37.     Whether [on] November 4, 2013, CO III Odom forwarded an inmate informal complaint response stating:  "This is in response to your informal complaint dated 10/21/13 in regards to inmate notification number 20-13 the revised kosher diet menu.   Per Chaplain Miser the implementation of the new kosher diet has been postponed.   On 10/22.13, I contacted Mr. Linderman, Administrator of Pastoral Activities, who advised that since your proposed resolution is to receive a date-specific menu, you should be informed that you are currently receiving the approved kosher diet. Mr. Linderman added that since menus are subject to change, the A.D.C. cannot guarantee you a menu issued on a specific date with no subsequent changes."

38.     Whether the Plaintiff ever requested a date specific menu or ever received the approved kosher diet as alleged.

39.     Whether [on] November 5, 2013, the Plaintiff forwarded an inmate grievance due to no resolution on November 4, 2013.

40.     Whether [on] November 6, 2013, the Plaintiff forwarded an inmate grievance appeal to Complex Warden Hetmer due to no resolution November 6, 2013 from Deputy Warden Jack Heet.

41.     Whether [on] December 11, 2013, Florence Complex Warden Lance Hetmer forwarded an inmate letter response to Plaintiff stating: . . . "I am upholding the Unit Deputy Warden's decision and denying the above grievance (A01-095-013).  The questions you requested answers for are no longer valid, as the Department has decided not to implement the previously proposed menu changes at this time.  In addition please note that what an inmate receives as part of his lawsuit will not be discussed with you, nor will you receive what he does.  As a reminder participating in the kosher meal is voluntary.  If your wish to discontinue it, you may contact your Unit Chaplain and they will remove you from the religious diet.  As a result, your issue has resolved."

42.     Whether the Plaintiff on December 11, 2013, submitted his final grievance to Director Ryan due to not receiving a resolution form Florence Complex Warden Hetmer and falsely accusing the Plaintiff of receiving a kosher diet.  (A37-119-010.)

43.     Whether [on] July 28, 2005, an affidavit of Manual L. Morrison in C.A. No. CV-04-1102-PHX-SMM (HCE); Joe Lowell McElyea v. Dora Schriro, et al. was submitted to the Court.

44.     Whether [on] October 10, 2013, Angelo Daniels sent a message:  "New kosher/Halal menu; stating hello everyone, I have just been contacted by Mike Linderman that there have been come concerns raised by religious representatives regarding this new program.  Mr. Linderman is writing a new proposal after meeting with the Director for his approval.  Effective today the start of these menus is postponed and it will not begin on the previously set date of October 16, 2013.  I have contacted Trinity this morning regarding the postponement and they understand and will do what is

necessary to extend the current kosher menu practice.  As things progress I will keep you informed.  Thank you for your patience in this matter."

45.     Whether the revised October 2013 associate and inmate training document topic:  Proper Preparation of Hot Meals for Kosher Menu Plan is Effective and Currently Used.

46.     Whether Defendants established genuine issue as to any material facts which justifies their denial of a Halal meat diet and shaving waiver to the Plaintiff.

47.     Whether the conduct of the Defendants was the proximate cause of substantial burdens and damage to the Plaintiff.

48.     Whether Defendants actions of failures to act amounted to deprivations of the Plaintiff's constitutional and statutory rights.

49.     Whether Defendants shall stipulate to the authenticity and admissibility of documents introduced into evidence by the Plaintiff.

50.     Whether Defendants knew they were in violation of clearly established law.

51.     Whether Defendants took no or wholly inadequate action in the fact of actual knowledge of violations to the Plaintiff.

52.     Whether Defendants actions of omission or commission was more than in advertence, lack of due care, negligence or error.

53.     Whether Defendants are required to know the law and to act according to the law.

54.     Whether Defendants who engaged in an activity which violates the law is responsible for his actions; whether he intended to violate the law or not.

55.     Whether Defendants had information which would lead a reasonably prudent person to make inquiry through which he would surely learn the facts; then

1    Defendants may be found to have had actual knowledge of those facts; the same as if

2    they had made such inquiry and had actually learned such facts.

3        **Plaintiff's Objections:**

4        1.      Plaintiff's Objection - Defendants' (JPPO) page three, line 15-19 states:

5    "The record shows Nance first requested a shaving waiver years after his incarceration

6    and identification as a Muslim . . . Although he initially failed to articulate a religious

7    reason for his shaving waiver upon his return to ADC custody, he subsequently provided

8    a religious reason and was granted a religious shaving waiver on June 16, 2011."

9        2.      Plaintiff's Objection - Defendants' Motion for Summary Judgment filed

10   6/21/13 on page three lines 4-6 states:   "During this term of incarceration he was

11   provided a kosher or vegetarian religious diet (ADC records are unclear which) and a

12   shaving waiver, but not a Halal diet.  (DSOF ¶ 8)."

13       Plaintiff's Objection - based upon information and belief never received a

14   permanent medical shaving waiver, he was required to renew his medical shaving waiver

15   annually.

16       3.      Plaintiff's Objection - Based upon information and belief obtained a

17   religious shaving waiver in 2006.   ADC officials modified their grooming policy

18   acknowledging a beard as a religious tenet of the Plaintiff.   Plaintiff received a new

19   shaving waiver approximately February 9, 2006.

20       4.      Plaintiff's Objection - Defendants' (JPPO) page three, lines 21-23 states:

21   "Although he initially failed to articulate a religious reason for his shaving waiver upon

22   his return to ADC custody, he subsequently provided a religious reason and was granted

23   a religious shaving waiver on June 16, 2011."

24       5.      Plaintiff's Objection - Plaintiff on October 31, 2010, met with Allen Miser

25   to establish his sincerely held religious beliefs.

26

27

28
                                    23

6.     Plaintiff's Objection - Defendants' (JPPO) page five, lines 14-18 states: "Defendants contend that the ADC religious diet policy . . . Further, the administrative requirement that an inmate articulate a religious reason for a shaving waiver is rationally connected to the legitimate state interests of maintaining a secure and safe environment."

7.     Plaintiff's Objection - Based upon Case No. CV-08-0255-TUC-CKJ, Order of the Court signed by the Honorable Cindy L. Jorgenson, U.S. District Judge and Settlement Agreement and Release signed April 20, 2012, which established ADC's failure to provide a compelling interest for their grooming policy.

8.     Plaintiff's Objection - Defendants' (JPPO), page six,. Lines 7-11 states: "Though Nance now desires to eat meat, and have that meat prepared consistent with halal practice, he cannot demonstrate that this preference is more than a positive expression of belief.  There is no evidence that Nance's belief that he needs to eat meat is a religious commandment, or that eating a vegetarian or pork-free kosher diet imperils his soul."

9.     Plaintiff's Objection - Based upon his sincerely believing he's commanded to eat Islamically slaughtered meat and this belief is footed in the religion of Islam.

10.     Plaintiff's Objection - Defendants' (JPPO) page six, lines 4-6 states: "Defendants and their witnesses will confirm that, as long as Nance is not forced to eat pork, any other non-meat diet can be construed as conforming to Halal standards."

11.     Plaintiff's Objection - Based upon the Court's Discovery and Scheduling Order where Plaintiff requested responses to Rules 33-34, interrogatories and production of documents.   Defendants failed to provide names of ADC Islamic advisors and documents.

12.     Plaintiff's Objection - Defendants' (JPPO) page six, lines 17-21 states: "Nance has the opportunity to participate in restricted religious diets . . . and have special arrangements made during the month-long observation of Ramadan . . . ."

13.    Plaintiff's Objection - Based upon his sincerely held belief he's commanded to eat Islamically slaughtered meat as a form of worship, also upon Case CV-13-0313-PHX pending before the Court alleging violations of constitutional and statutory rights of Plaintiff during Ramadan 2012-2013.

14.    Plaintiff's Objection - Defendants' (JPPO) page six, lines 12-16 states: "Additionally, Nance is entitled to purchase and use a variety of religious materials and supplies . . . ."

15.    Plaintiff's Objection - Defendants' statement is inaccurate.  Plaintiff cannot receive Misuak, or Halal scented religious oils, nor utilizes an offering bowl.  There is no alternative to a Halal meal religious diet.

16.    Plaintiff's Objection - Defendants' (JPPO) page six, lines 19-21 states: "and have special arrangements made during the month-long observation of Ramadan, a period of fasting and prayer, to allow him to take his meals at the religiously prescribed times."

17.    Plaintiff's Objection - Case No. CV-13-0313 (PHX-RCB-DKD).

18.    Plaintiff's Objection - Defendants' (JPPO) page seven, lines 3-5 states:  ". There would be a significant disruption of culinary services if Defendants and the ADC were required to provide a special meal for one prisoner."

19.    Plaintiff's Objection - Defendants proposed Halal/Kosher vegetarian meal dated May 6, 2013, stipulates inmate Kenneth Ashelman would be the only inmate to continue to receive a kosher meat based diet.

20.    Plaintiff's Objection - Defendants' (JPPO) page 13, lines 19-20, states: "2002-2008, he served seven (7) years . . . for Attempted Sexual Conduct with a Minor."

21.    Plaintiff's Objection - The Plaintiff served six (6) years with ADC and was convicted of Attempted Sexual Assault on one Donna Yellowhair his live in girlfriend who is one year older than the Plaintiff (56) years old.

22.     Plaintiff's Objection - Defendants' (JPPO) page 14, lines 25-26 states:  "At no time has Nance or any other member of the Muslim or legal communities indicated Muslims are required to eat meat."

23.     Plaintiff's Objection - The Plaintiff sincerely believes he's commanded by Quran, Sunnah, Fiqh, and Sharuah to eat Islamically slaughtered meats.

24.     Plaintiff's Objection - Defendants' (JPPO) page 15, lines 1-2 states:  "If a Muslim does choose to eat meat, it is considered *haram* (or forbidden) to consume pork."

25.     Plaintiff's Objection - The Plaintiff sincerely believes he's commanded to eat Islamically slaughtered meat as a form of worship.  Such meats must fulfill Islamically slaughter rules known as Thabihah (slaughter).

26.     Plaintiff's Objection - Defendants' (JPPO) page 15, lines 6-7 states: "ADC is currently instituting a new vegetarian diet program that has been certified by both Jewish (kosher) and Islamic (Halal) representatives."

27.     Plaintiff's Objection - The Plaintiff exhausted his administrative grievance in an attempt to obtain the name of Islamic Cleric's or Certification Agency whom allegedly certificated the proposed vegetarian Halal/kosher menu.  To no avail, ADC officials failed to produce material evidence.

28.     Plaintiff's Objection - Defendants' (JPPO) page 30, lines 10-11, Voir Dire questions of Plaintiff.

29.     Plaintiff's Objection - Defendants failed to list Plaintiff's final proposed (JPPO) Voir Dire Questions as submitted.

**Defendants:**

1.     Whether Defendants violated Nance's his freedom to practice his religion under the Free Exercise Clause of the First Amendment by not offering him a religious diet with Halal meat?;

26

2.      Whether Defendants violated Nance's rights under the Equal Protection Clause of the Fourteenth Amendment by offering religious diet program diets to other religious adherents, but no Halal meat to Muslims?;

3.      Do ADC's policies and administrative requirements reflect the least restrictive means by which to accomplish the compelling government interest in maintaining a safe and secure prison environment, and limiting expenditures?

4.      Whether Defendants are entitled to qualified immunity regarding Nance's Constitutional claims?;

5.      Whether *Turner v. Safley* factors weigh in favor of Defendants?; and

6.      Whether Defendants have violated RLUIPA by burdening Nance's religious practice by failing to offer Halal meat to Nance?

7.      Why did Nance initially apply for and accept a medical shaving waiver?;

8.      Why did Nance subsequently not re-apply for a medical shaving waiver when he was re-incarcerated?;

9.      Why did Nance fail to articulate a religious reason in support of his requests for a religious shaving waiver?; and

10.     Why did Nance accept pork-free diets as consistent with his religious faith, yet subsequently reject those same diets and complain they violate his Constitutional and statutory rights?;

**F.     LIST OF WITNESSES.**

Plaintiff:

1.      Keith P. Nance - Plaintiff will testify to facts concerning his sincerely held religious beliefs of Islam.  Islamic rulings on a Halal Religious Diet.  Practices, policies, and customs which created a substantial burden upon his religious exercise by named Defendants.  Deprivation of religious exercise which caused spiritual constraints,

1   defilement of soul, and distress.  How on October 31, 2010, he explained sincerely held

2   beliefs to Allen Miser.

3        2.     Adam Shabazz, Imam of Islam, shall testify of Halal food requirement

4   commanded by the Holy Quran, Sunnah of Prophet Muhammad, and Shariah Islamic

5   law.

6        3.     Seymour J. Abdullah #40697 is expected to testify to his sincerely held

7   belief Muslims are commanded to grow beards, provide personal knowledge how he

8   obtained a religious shaving waiver recommended by Mike Linderman and approved by

9   Director Charles Ryan.

10        4.     Allen Miser Chaplain is expected to testify regarding an interview held

11   October 31, 2010.  That he is employed at ADC as Chaplain and he denied Plaintiff's

12   request.

13        5.     James Vicklund Senior Chaplain is expected to testify he is employed as

14   Senior Chaplain at A.D.C. and he was Allen Miser's immediate supervisor.  He also

15   responded to the Plaintiff's inmate letters as Senior Chaplain.

16        6.     Mike Linderman Pastoral Administrator is expected to testify that he is

17   employed at ADC as Pastoral Administrator and supervises Senior Chaplains and Unit

18   Chaplains and that part of his responsibilities is to ensure subordinates are held

19   accountable for compliance with Departmental Orders and allegations of employee

20   misconduct at any level are thoroughly investigated and resolved.

21        7.     Robert Patton is expected to testify he is employed at A.D.C. as Deputy

22   Director of Offender Operations.  Part of his responsibilities is to manage the inmate

23   grievance system.  He is also responsible to ensure subordinates are held accountable for

24   compliance with Departmental Orders and allegations of employee misconduct at any

25   level are thoroughly investigated and resolved.

26

27

28

**Defendants:**

All witnesses listed by Nance.  In addition to the descriptions of anticipated testimony provided by Nance, Defendants anticipate that ADC Administrator of Pastoral Activities Michael Linderman will testify regarding the additional costs, fees, logistical challenges, and overall administrative burdens associated with identifying, bidding on/procuring, purchasing, transporting, receiving, storing, and distributing Halal meat/meals that satisfies the requirements of the Muslim population at ADC facilities, including Nance.  Mr. Linderman will testify that the least restrictive means of pursuing the legitimate state interests of safety, security, efficiency, and cost-effective administration of resources (including bulk meal purchasing), is to offer Muslims pork-free diets and not specifically provide Halal meat/meals.

Leon George, ADC Chief Procurement Officer, to discuss the ADC procurement process and inclusion of regulatory compliance, as well as State contractual compliance provisions in a contract; and

Keith Smith, ADC Security Operations Administrator, to discuss food services contract monitoring.

**G.    LIST OF EXHIBITS.**

**Plaintiff:**

1.    Probation Violation Report listing the Plaintiff's conviction.

2.    October 26, 2010 Inmate Letter to Allen Miser.

3.    June 27, 2013 Declaration of Keith P. Nance.

4.    April 12, 2012 Declaration of Darrell L. Wiles.

5.    August 1, 2011 Declaration of Lee Comier, Jr.

6.    November 5, 2010 Inmate Letter to James Vicklund.

7.    December 1, 2010 Response from Allen Miser.

8.    December 2, 2010 Informal Grievance.

9.    December 8, 2010 Response from CI II Shalley.

10.   December 8, 2010 Informal Grievance.

11.   December 10, 2010 Grievance Appeal.

12.   December 27, 2010 Grievance Appeal (Diet).

13.   December 27, 2010 Grievance (Comment).

14.   December 27, 2010 Inmate Letter to CO II Shalley.

15.   January 12, 2011 Inmate Letter to James Vicklund (RAC).

16.   January 11, 2011 Response from James Vicklund.

17.   January 13, 2011 Grievance Appeal (Comments).

18.   January 17, 2011 Inmate Letter to CO III Cione.

19.   January 17, 2011 Grievance Appeal to Director (Diet).

20.   February 8, 2011 Inmate Letter to MS Rivera (Diet).

21.   February 4, 2011 Grievance to Director (Comments).

22.   February 11, 2011 Inmate Letter to Mike Linderman.

23.   February 14, 2011 Response from ADW Faye.

24.   February 17, 2011 Inmate Letter to James Vicklund.

25.   February 21, 2011 Inmate Letter to CO III Green.

26.   February 22, 2011 Response from CO III Green.

27.   February 23, 2011 Response from James Vicklund.

28.   February 28, 2011Grievance Appeal (A37-119-010).

29.   April 25, 2013 - CV 12-0734 - Motion to Compel et al., Exhibits.

30.   April 5, 2011 Response from Warden Trujillo (A12-119-010).

31.   April 4, 2011Grievance (A12-119-010) to Director.

32.   May 25, 2011 Grievance Response from Director (A12-119-010).

33.   June 14, 2011 Inmate Letter to James Vicklund (Diet).

34.   June 21, 2011 Inmate Letter to Director (Diet).

1     35.    June 21, 2011 Inmate Letter to Mike Linderman (Diet).

2     36.    July 7, 2011 Response from Robert Patton (A12-019-010) Diet.

3     37.    July 13, 2011 Inmate Letter to Robert Patton (Signing Diet).

4     38.    August 5, 2011Response from Robert Patton (Diet).

5     39.    August 11, 2011Inmate Letter to James Vicklund (Bibles/ No Quran).

6     40.    August 11, 2011 Inmate Letter to James Vicklund (Halal Standards).

7     41.    August 25, 2011Response from Mike Linderman (Acceptable/Islam).

8     42.    September 1, 2011 Response from James Vicklund (Bibles/Qurans).

9     43.    Inmate Notification Vegan Diet June 1, 2011 (#25-11).

10     44.    Fatawa (Ruling) on Halal Religious Diet Mujlisul Ulama of S.A..

11     45.    Islamic Center of Tucson Letter.

12     46.    Imam Hamad Chebli, Islamic Society of Central Jersey.

13     47.    Mid Aman Products Halal Food Supplier.

14     48.    Support Service Position Paper:  Kosher/Halal 5/6/13 (Exh G) (Exh 52).

15     49.    Halal Haram Meat According to Islamic Principles.

16     50.    Quranic Verses Eating of Halal Meats.

17     51.     Duplicate Exhibit - Eight.

18     52.    Duplicate Exhibit #48 and Defendants' Exhibit "6".

19     53.    Defendants' Statement of Facts 6/21/13.

20     54.    Mike Linderman's Declaration 6/21/13.

21     55.    Mike Linderman's Response to First Set of Interrogatories 4/1/13.

22     56.    Robert Patton's Declaration 6/13/13.

23     57.    Allen Miser Declaration 6/13/13.

24     58.    Allen Miser's Response for P.O.D. 4/1/13.

25     59.    Allen Miser's Response to Interrogatories 3/5/13.

26     60.    Allen Miser's Response to Interrogatories 3/29/13.

27

28

61.   See Exhibit Twenty-Nine - Motion to Compel:  (Exhibit Nine) Robert
      Patton's Admissions; (Exhibit Ten) Allen Miser's Admissions; (Exhibit
      Eleven) James Vicklund's Admissions; (Exhibit Twelve) Mike
      Linderman's Admissions; (Exhibit Thirteen) Mike Linderman's
      Interrogatories (Exh. 55); (Exhibit Fourteen) James Vicklund's
      Interrogatories; (Exhibit Sixteen) Allen Miser's P.O.D. (Exh 58); (Exhibit
      Seventeen) James Vicklund's P.O.D.; (Exhibit Eighteen) Mike
      Linderman's P.O.D.; (Exhibit Nineteen) Robert Patton's P.O.D.; (Exhibit
      Twenty) Missing Documents regarding Plaintiff's grievance on Allen
      Miser's comments.

62.   Plaintiff's Affidavit.

63.   Plaintiff's First Amended Complaint.

64.   Affidavit of Marvel L. Morrison:  C.A. No. CV-04-1102-PHX-SMM.

65.   Inmate Letter to Miser 9/25/13 (Certification).

66.   Inmate Letter to Linderman 9/25/13 (Certification).

67.   Inmate Letter Response from Linderman (Oct. 15, 2013).

68.   Plaintiff's Informal on Certification 10/21/13.

69.   Inmate Informal Response from CO III Odom 11/4/13.

70.   Inmate Grievance A02-095-013 (Certification) 11/5/13.

71.   Inmate Grievance Appeal - 11/6/13.

72.   Inmate Grievance Response 12/11/13.

73.   Inmate Grievance to Director Ryan on Certification.

74.   Angelo Daniels:  Halal/Kosher Vegetarian Menu.

75.   Associate and Inmate Training; Kosher Food Preparation.

76.   Inmate Notification #20-13; 9/16/13 Certified Menu.

77.   ADC Kosher/Halal Meal Plans #120094DC:  9/9/13.

78.     ADC Jewish Passover Menu.

79.     Inmate Letter to Director Ryan 9/25/13.

80.     Islamic Services of America/Letter on Certification.

**Defendants:**

1.      All exhibits listed by Plaintiff;

2.      Administrative and budgetary records of outlays for inmate diets;

3.      Administrative and budgetary records reflecting burdens associated with identifying, bidding, procuring/purchasing, transporting, receiving/obtaining, distributing, storing, and providing Halal meat to inmates;

4.      Website materials from vegan and vegetarian Muslim websites, including http://www.islamveg.com/; http://www.vegetarianmuslims.org/; http://www.veggiedate.org/Muslim-Vegetarian.cfm; http://www.jpost.com/Middle-East/For-Muslim-vegetarians-Eid-sacrifice-is-no-celebration; and http://www.ipaki.com/content/html/28/1203.html;

5.      Select portions of the Qur'an;

6.      Photographs of existing ADC food storage facilities, kitchens, canteens, refrigerators, food delivery vehicles, and supply depots;

7.      Photographs of Muslim/halal slaughter houses, food storage facilities, kitchens, canteens, refrigerators, food delivery vehicles, and supply depots;

8.      Arizona Department of Health Services guidelines, http://www.azdhs.gov/phs/oeh/fses/food-safety-rules.htm

9.      Arizona Department of Health Services' Arizona Food Code Technical Manual, http://www.azdhs.gov/phs/oeh/rs/pdf/fc2000.pdf; and

10.     Arizona Department of Health Services' Arizona State Food Safety Rules, http://www.azsos.gov/public_services/Title_09/9-08.htm#Article_1;

**H.    LIST OF DEPOSITIONS.**

None were taken.

**I.    MOTIONS IN LIMINE.**

Motions in limine are intended to encompass only significant evidentiary issues and are generally discouraged.  Such motions if allowed shall be filed by or before N/A.

**J.    LIST OF ANY PENDING MATTERS.**

1.    Motions in Limine (Doc. 83).

2.    Plaintiff's Request for Issuance of a Writ of Habeas Corpus Ad Testificandum for Seymour J. Abdullah #40697;

3.    Plaintiff's Request for Issuance of a Writ of Habeas Corpus Ad Testificandum for Keith P. Nance #168108; and

4.    Plaintiff  Request for Issuance of a Subpoena as to plaintiff's witness Adam Shabazz, Imam of Islam.

The Court hereby **GRANTS** plaintiff's requests for issuance of Writs for witness Seymour J. Abdullah and plaintiff Keith P. Nance (¶¶ J(2) and (3)).  Further, the defendants having no objection, the Court hereby **GRANTS** the plaintiff's request for the issuance of a subpoena as to plaintiff's witness Adam Shabazz (¶ J(4)).   To facilitate issuance of the subpoena as to Adam Shabazz, by no later than May 2, 2014, plaintiff Nance **shall** notify the court and the defendants in writing of Mr. Shabazz's last known address.

**K.    PROBABLE LENGTH OF TRIAL.**

Plaintiff estimates three days.

Defendants estimate four days.

**L.    PROPOSED JURY INSTRUCTIONS.**

Plaintiff and defendant shall file proposed jury instructions by **June 10, 2014**.

**M.      VOIR DIRE QUESTIONS.**

**Plaintiff:**   Plaintiff shall file proposed voir dire questions, not to exceed 54 questions,  by no later than **April 11, 2014**.

**Defendants:**

1.      Has anyone has personal experience with being unable to obtain certain religious items, materials, worship opportunities, or food while incarcerated?;

2.      Has anyone known anyone who was unable to obtain certain religious items, materials, worship opportunities, or food while incarcerated?;

3.      If so, what were the circumstances?;

4.      Did the difficulty occur in a municipal or county jail or in an ADC prison?;

5.      Does anyone believe it is wrong to ask about someone's religious beliefs?;

6.      Does anyone believe it is wrong to challenge an individual's sincerity when it comes to their declared religion?; and

7.      Does anyone believe that it is wrong to challenge a felon's sincerity regarding his declared religion when, after release from prison, he recidivates and returns to prison?

The **Trial** is set for **Monday, July 14, 2014, at 9:00 A.M.** (estimated length of trial: 4-5 days), Courtroom 606, Sixth Floor, Sandra Day O'Connor United States Courthouse, 401 West Washington Street, Phoenix, Arizona; plaintiff *pro se* and counsel **SHALL APPEAR** at  **8:30 A.M.** to discuss pretrial matters.

DATED this 31st day of March, 2014.

_____
Robert C. Broomfield
Senior United States District Judge

35