WO

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Keith P. Nance,

               Plaintiff,

   v.

Allen Miser, et al.,

               Defendants.

No.  CV 12-0734-PHX-SMM (DKD)

**O R D E R**

    Plaintiff Keith P. Nance, who is currently confined in Arizona State Prison Complex-Florence, brought this civil rights case pursuant to 42 U.S.C. § 1983.  (Doc. 9, First Am. Compl.).  On June 21, 2013, Defendants filed a Motion for Summary Judgment (Doc. 54) that the Court denied in its Order of October 7, 2013.  (Doc. 69).  Defendants filed a Motion for Reconsideration (Doc. 71) that the Court also denied.  (Doc. 75).

    On June 11, 2014, Defendants filed a "Motion for Leave to File Renewed Motion for Summary Judgment and Oversized Brief" (Doc. 123) and submitted a Proposed Renewed Motion for Summary Judgment and a Proposed Supplemental Statement of Facts.  (Lodged as Docs. 125, 126).  On January 13, 2015, the Court granted Defendants' Motion for Leave to File, and the Clerk of Court filed Defendants' Renewed Motion for Summary Judgment ("RMSJ") and Supplemental Statement of Facts ("DSSOF").  (Docs. 134, 135).  The RMSJ has been fully briefed.  (Docs. 137, 140).[1]

_____

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response.  (Doc. 136).

1    The Court will grant the RMSJ in part and deny it in part as set forth below.

2    **I.    Background**

3    In his First Amended Complaint, Plaintiff alleges that Miser, Vicklund,
4    Linderman, and Patton denied him a halal diet and shaving waiver in violation of the
5    Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the First
6    Amendment.  Plaintiff alleges the absence of a compelling governmental reason for
7    denying him a halal diet and that such denial substantially burdened the free exercise of
8    his religious beliefs.  He further alleges that Defendants violated his equal protection
9    rights because, as a Muslim adherent, Plaintiff is not provided a halal diet, while
10   adherents of other faiths are provided diets consistent with their religious beliefs.  On
11   screening under 28 U.S.C. § 1915A, the Court directed Miser, Vicklund, Linderman, and
12   Patton to respond to Plaintiff's free exercise and equal protection claims.  (Doc. 14).

13   In its October 7, 2013 Order denying Defendants' Motion for Summary Judgment,
14   the Court dismissed Plaintiff's RLUIPA claim for damages, but denied summary
15   judgment to Defendants on Plaintiff's RLUIPA claim for injunctive relief, finding that
16   material questions of fact existed regarding (1) whether Plaintiff's asserted beliefs were
17   sincerely held, (2) whether the denial of a halal diet with meat substantially burdened
18   Plaintiff's religious exercise, and (3) whether the prison's existing diet plan was the least
19   restrictive means of furthering a compelling governmental interest.  The Court also
20   denied summary judgment to Defendants on Plaintiff's First Amendment claim, finding
21   that Defendants were not entitled to qualified immunity on this claim, and that, absent
22   any facts about the costs of accommodating Plaintiff's dietary requests, there was
23   insufficient evidence to rule, as a matter of law, that Defendants' denial of Plaintiff's
24   request was reasonably related to legitimate governmental interests.  Finally, the Court
25   denied summary judgment to Defendants on Plaintiff's equal protection claim because
26   the record was too incomplete to show that Defendants had a legitimate penological
27   justification for providing a kosher diet with meat to Jewish inmates but not a halal diet
28   with meat to Muslim inmates.

In addition to Plaintiff's diet-based claims, the Court denied summary judgment to Defendants on Plaintiff's First Amendment claim for damages based on Defendants' refusal to grant him a shaving waiver. This was because, even though Plaintiff received a shaving waiver in May 2011, precluding a claim for injunctive relief, Defendants did not dispute that Plaintiff had been denied a waiver for the first seven months after his re-incarceration.

As put forth in the Court's October 7, 2013 Order, Plaintiff's remaining claims are (a) his RLUIPA and First Amendment claims for injunctive relief regarding the denial of a halal diet with meat, (b) his First Amendment claim for damages regarding the denial of a halal diet with meat, (c) his equal protection claim for injunctive relief and damages regarding the denial of a halal diet with meat, and (d) his First Amendment claim for damages regarding the seven-month delay before he received a shaving waiver.

In the RMSJ, Defendants argue that new dietary cost and grievance information now shows that there are no remaining issues of material fact and Defendants are entitled to judgment as a matter of law on all claims. (Doc. 134 at 1). With respect to Plaintiff's dietary claims, Defendants argue that providing a halal diet with meat would be cost-prohibitive, and ADC has provided reasonable alternatives or good faith accommodations that satisfy both RLUIPA and constitutional requirements. (*Id.* at 6-17). With respect to Plaintiff's shaving-waiver claim, Defendants argue that they are not liable for the seven-month delay in providing the waiver because the delay was not excessive, and it resulted from Plaintiff's own failure to articulate his religious reasons for needing the waiver and his subsequent mishandling of the grievance and appeal process. (*Id.* at 17-19). Defendants reassert a claim that all Defendants are entitled to qualified immunity. (*Id.* at 19-24). They further assert that Defendants Patton and Vicklund are not liable for any alleged violations because they were not directly involved in the alleged denials of Plaintiff's rights, and Miser is not liable because he did not violate Plaintiff's rights by

finding that he had to reapply for his requested religious accommodations, and he was entitled to inquire about the sincerity of Plaintiff's beliefs.  (*Id.* at 25-27).[2]

In his Response, Plaintiff reiterates his claim that he is a practicing Muslim for whom eating halal meat is a religious requirement.  (Doc. 137 at 3, 5).  Plaintiff argues that ADC's existing religious diets, which do not include halal meat, substantially burden the free exercise of his religious beliefs, and Defendants erred by concluding that he could practice his religious beliefs in other ways.  (*Id.* at 8-10).  Plaintiff further argues that the new evidence Defendants put forth regarding costs is unreliable, and Defendants have failed to show why ADC cannot provide a halal diet with meat when other states and the Federal Bureau of Prisons ("FBOP") are able to do so.  (*Id.* at 10-11).  Plaintiff also argues that the delay in getting his shaving waiver was due to the actions of Defendants and not to Plaintiff's own failures to comply with ADC policies as Defendants assert.

## II.    Legal Standards

### A.    Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   Under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party who must demonstrate the existence of a factual dispute and that the fact

---

[2] Defendants erroneously assert that Patton and Vicklund are entitled to qualified immunity on this basis, but the facts they put forward regarding these Defendants' limited involvement in the alleged violations are not a basis for qualified immunity.  Defendants should be aware that qualified immunity requires an analysis of whether the rights allegedly violated were clearly established at the relevant time.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 250; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968).

When considering a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits or declarations, if any. *See* Fed. R. Civ. P. 56(c). At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But, if the evidence of the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 248-49. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment").

## B.    Free Exercise of Religion

"Inmates retain the protections afforded by the First Amendment, 'including its directive that no law shall prohibit the free exercise of religion.'" *Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)). To implicate the Free Exercise Clause, a prisoner must show that the belief at issue is both "sincerely held" and "rooted in religious belief." *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994); *see Shakur*, 514 F.3d 884-85 (noting the Supreme Court's

disapproval of the centrality test and finding that the sincerity test in *Malik* determines whether the Free Exercise Clause applies).

If the inmate makes his initial showing, he must establish that prison officials substantially burden the practice of his religion by preventing him from engaging in conduct which he sincerely believes is consistent with his faith. *Shakur*, 514 F.3d at 884-85.

A regulation that burdens the First Amendment right to free exercise may be upheld only if it is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 89 (1987). This determination requires analysis of four prongs: (1) there must be a valid, rational connection between the regulation and the legitimate governmental interest; (2) whether there are alternative means of exercising the right that remain open to inmates; (3) the impact accommodation of the right will have on guards and other inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives. *Id.* at 90.

Under RLUIPA, a government may not impose a substantial burden on the religious exercise of a confined person unless the government establishes that the burden furthers a "compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). This "compelling government interest" and "least restrictive means" test replaced *Turner*'s "legitimate penological interest" test. *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005) (citing 42 U.S.C. § 2000cc-1(a)). Under its own terms, RLUIPA must be "construed broadly in favor of protecting an inmate's right to exercise his religious beliefs." *Id.* at 995 (citing 42 U.S.C. § 2000cc-3(g)).

The inmate bears the burden of establishing prima facie that RLUIPA has been violated and that his religious exercise has been substantially burdened. *Warsoldier*, 418 F.3d at 994 (citing 42 U.S.C. § 2000cc-2(b)). The government then bears the burden of proving that the substantial burden on the inmate's religious practice both furthers a

compelling governmental interest and is the least restrictive means of doing so.  *Id.* at 995 (citing 42 U.S.C. §§ 2000cc-1(a), 2000cc-2(b)).

### C.    Equal Protection

The Equal Protection Clause requires that persons who are similarly situated be treated alike.  *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985); *Shakur*, 514 F.3d at 891.  An equal protection claim may be established by showing that prison officials intentionally discriminated against a plaintiff based on his membership in a protected class, *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 702–03 (9th Cir. 2009); *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003), *Lee v. City of L.A.*, 250 F.3d 668, 686 (9th Cir. 2001), or that similarly situated individuals were intentionally treated differently without a rational relationship to a legitimate state purpose, *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601–02 (2008); *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 592 (9th Cir. 2008).

In addition, an inmate "'must set forth specific facts showing that there is a genuine issue' as to whether he was afforded a reasonable opportunity to pursue his faith as compared to prisoners of other faiths" and that "officials intentionally acted in a discriminatory manner."  *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997), *abrogated on other grounds* by *Shakur*, 514 F.3d at 884-85.  Taking from *Turner*, the Court must consider whether "the difference between the defendants' treatment of [Plaintiff] and their treatment of [other] inmates is 'reasonably related to legitimate penological interests.'"  *Shakur*, 514 F.3d at 891 (citing *DeHart v. Horn*, 227 F.3d 47, 61 (3rd Cir. 2000)).  A mere rational basis for disparate treatment of inmates of different religious faiths is not sufficient.  *Shakur*, 514 F.3d at 891.

### III.   Background Facts

ADC has accommodated the religious dietary requests of Muslim inmates for 20 years by providing a pork-free diet.  (Doc. 135-1 at 9, Linderman Decl. ¶ 68).  Nearly ten years ago, ADC also began offering a vegetarian diet, allowing Muslim inmates to avoid

eating any meats not properly blessed and slaughtered according to Islamic guidelines. (*Id.* ¶ 69).  ADC also offers a kosher diet, which contains no pork, and which contains only meats that have been prepared in accordance with kosher guidelines.  (*Id.* ¶¶ 78, 83). Plaintiff alleges that he is a practicing Muslim, and the halal diet is of central importance to his religious beliefs.  (Doc. 9 at 5).  Between 2002 and 2008, Plaintiff was in ADC custody, and he was provided a vegetarian religious diet and a shaving waiver.  (DSSOF ¶ 8).

In September 2010, Plaintiff was again committed to ADC custody to serve a 20-year sentence for kidnapping and domestic violence.  (DSSOF ¶ 9).  Shortly after his return to ADC, Plaintiff requested a religious diet and a shaving waiver on religious grounds.  (DSSOF ¶ 10.)  In the course of Plaintiff's reapplication process, Defendants assert that they disputed whether Plaintiff had a religious reason for his requests. (DSSOF ¶ 11).  Plaintiff asserts that Miser interviewed him on or about October 31, 2010, and he questioned Plaintiff's religious sincerity, asking him, "How as a Muslim can you be convicted of child molestation?"  (Doc. 9 at 3; Doc. 116 at 1-2).  Plaintiff asserts that he asked Miser where he had heard this and what it had to do with his dietary and shaving requests.  (*Id.*).  After 30 days, Plaintiff began a grievance concerning his as-yet-unanswered requests for a religious diet and shaving waiver; he also began a separate grievance for harassment, discrimination, and inappropriate verbal confrontation based on Miser's question.  (Doc. 9 at 3-4; Pl. Exs. 8, 10 (Doc. 112-1 at 29, 33)).  On May 25, 2011, following a series of grievances from Plaintiff, Director Ryan approved Plaintiff's request for a religious diet and a shaving waiver.  (DSSOF ¶ 64).

Plaintiff met with Miser on June 16, 2016, and Miser gave him the option of a kosher diet or a vegetarian diet, which ADC considers proper under halal standards.  (*Id.* ¶¶ 65, 70).  Plaintiff accepted the shaving waiver but rejected the kosher or vegetarian diets.  (*Id.* ¶¶ 66, 67).  Plaintiff claims that the kosher diet offered by ADC does not comply with his sincerely held religious beliefs because it contains meat that is not halal;

he further claims that the vegetarian diet is not acceptable because he believes he is commanded to eat meat, and that meat must be halal.  (Doc. 138 ¶ 71).

## IV.   Discussion

The Court will grant the RMSJ in part to the extent that it will grant summary judgment to Defendants on Plaintiff's RLUIPA, First Amendment, and equal protection claims based on the denial of a halal diet with meat, and it will deny the RMSJ in part to the extent that it will deny summary judgment to Defendants on Plaintiff's free exercise claim for damages based on the denial of a shaving waiver for seven months.  The Court will dismiss Defendants Vicklund, Linderman, and Patton from this action.

### A.   Preliminary Issues

Defendants filed a "Motion to Strike Notice (Doc. 139) and Duplicate Filings" (Doc. 141) and an "Amended Motion to Strike Notice (Doc. 139) and Duplicate Filings." (Doc. 142).  Defendants argue that the Court should strike Plaintiff's Notice (Doc. 139), filed on February 9, 2015, in which Plaintiff reports that ADC's contracted paralegal interfered with his access to the courts by denying his requests for certain photocopies in this case.  (Doc. 142 at 2).  Defendants assert that the Notice does not qualify as an authorized pleading or motion under Federal Rules of Civil Procedure 7(a) or 7(b)(1). (*Id.*).  Defendants also argue that nearly all of the exhibits Plaintiff filed in his Response to the RSMJ (Doc. 138-1) duplicate what is already before the Court and therefore violate Local Rule of Civil Procedure 7.1, which prohibits such duplication.  (*Id.*).  Defendants further request that the Court assess Plaintiff its costs associated with filing these documents, as permitted under Local Rule of Civil Procedure 7.1(d)(5).  (*Id.* at 3).

The Court will deny Defendants' original Motion to Strike as moot and will grant Defendants' Amended Motion to Strike in part, to the extent that it will strike Plaintiff's Notice (Doc. 139) and Plaintiff's duplicate filings (Doc. 138-1).  The Court notes that where Plaintiff points to evidence on the record in his Response, he refers only to the exhibits he filed along with his Civil Exhibit List for this case (Docs. 112-117).  For purposes of this Order, the Court has looked to these exhibits and not to any of Plaintiff's

attachments in Doc. 138-1.  The Court will deny Defendants' Motion in part to the extent that it will not assess costs to Plaintiff under Local Rule of Civil Procedure 7.1(d)(5).

## B.    Free Exercise Claims Regarding Diet

Plaintiff claims that Defendants' refusal to provide him a halal diet with meat violates his free exercise rights under RLUIPA and the First Amendment.  (Doc. 9).  As the Court noted in its October 7, 2013 Order, under both a RLUIPA and a First Amendment analysis, a plaintiff must establish that he has a sincerely held religious belief and that the defendants have "substantially burdened" the practice of that belief.  (Doc. at 7, 10; *see* 42 U.S.C. § 2000cc-1(a); *Malik*, 16 F.3d at 333; *Shakur*, 514 F.3d at 884-85).   If the plaintiff makes this initial showing, the burden then shifts to the defendants under RLUIPA to show that the challenged policy serves a "compelling governmental interest" and is the "least restrictive means" of meeting that interest.  42 U.S.C. § 2000cc-1(a)(1)-(2).  Under a First Amendment analysis, defendants must show that the challenged policy is "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

The Court determined in its October 7, 2013 Order that Plaintiff had raised triable issues of fact that (1) he had a sincerely held religious belief requiring him to eat a halal diet with meat and (2) ADC's currently-offered dietary options substantially burdened the free exercise of that belief.  The Court finds no reason to revisit its prior analysis on these issues.  Thus, the remaining question presented by the RMSJ is whether the new evidence put forth by Defendants regarding costs shows that ADC's currently-offered religious diet options, which do not include a halal diet with meat, satisfy Defendants' burdens under RLUIPA and the First Amendment, thus entitling Defendants to summary judgment on those claims.  The Court finds that it does.

### 1.    RLUIPA

#### a.    Compelling Governmental Interest

Defendants argue that ADC's decision to provide its current religious diet options, but not a halal diet with meat, serves its compelling governmental interest of operating

within its budgetary constraints and maintaining prison security.  (Doc. 134 at 7-15).  Defendants assert that Trinity Food Services Group, Inc. ("Trinity") is ADC's exclusive food contractor.  (*Id.* at 14; Decl. Smith, ¶ 11(Doc. 135-1 at 34)).  Defendants put forth evidence that Trinity has identified vendors who can provide halal meals with meat to ADC at a cost of $8.82 per meal, which would include a precooked meat entre and starch component, but no fruit, vegetables, beverage, or dessert.  (DSSOF ¶¶ 104, 105; Smith Decl. ¶¶ 13, 14 (Doc. 135-1 at 34)).  According to Trinity's Regional Dietician, Laura Donnely, such meals on their own would not satisfy the recommended daily allowances for several nutrients and would therefore have to be supplemented at additional cost.  (DSSOF ¶¶ 106, Donelly Aff. ¶ 6 (Doc. 135-1 at 39-40)).  By comparison, a general population ("GP") meal or a vegetarian meal costs ADC $1.242, and a kosher meal costs it $2.00.  (Doc. 134 at 8; Smith Decl. ¶ 16 (Doc. 135-1 at 34)).  Based on these facts, Defendants assert that over the course of a year, a halal diet with meat would cost ADC $8,714.16 per inmate, compared to $1,227.10 per inmate for a GP or vegetarian diet and $1,976 per inmate for a kosher diet.  (Doc. 134 at 8; DSSOF ¶¶ 110, 111).  Thus, Defendants argue, the cost to satisfy Plaintiff's religious dietary request is 710% greater than the cost to provide a GP or vegetarian meal and 441% greater than the cost to provide a kosher meal.  (Doc. 134 at 8).  Defendants further assert that over the 20-year period before Plaintiff's anticipated release in 2034, ADC's cost to accommodate Plaintiff's request for a halal diet with meat would total $174,283.20, compared to $24,542 for a GP or vegetarian diet and $39,520 for a kosher diet over the same period.  (*Id.* at 8-9).

Defendants further project that if all of ADC's 1,098 Muslim inmates availed themselves of the halal diet with meat that Plaintiff requests, the annual cost of providing such meals would be $9,568,147.68, leading to increased costs to ADC of between $7,398,499.68 and $8,220,796.27 per year.  (Doc. 134 at 9-10; DSSOF ¶¶ 113-115).  Defendants put forth evidence showing that ADC's entire annual food budget is $40 million (DSSF ¶ 116), and they claim that this budget does not allow for a $7.4 million to

1    $8.2 million increase to accommodate Plaintiff's request.  (Doc. 134 at 10).  Defendants

2    argue on the basis of the above-cited facts that "ADC's compelling governmental interest

3    in staying within its budget and maintaining prison security override Plaintiff's request

4    for a halal meat diet."  (*Id.*)

5           Plaintiff does not put forth any evidence to create a genuine issue of fact about the

6    increase in costs ADC would incur if it were to provide a halal diet with meat to

7    accommodate his asserted religious beliefs.  Plaintiff argues, instead, that the evidence

8    Defendants put forth regarding costs "is lacking authentic evidence of solicited bids,

9    price quotes, manager's pre-cost, nutritional summary, named venders, certified halal

10   food specifications and data analysis."  (Doc. 137 at 9).  This argument is unpersuasive.

11          Federal Rule of Civil Procedure 56(c)(4) requires only that "[a]n affidavit or

12   declaration used to support . . . a motion [for summary judgment] must be made on

13   personal knowledge, set out facts that would be admissible in evidence, and show that the

14   affiant is competent to testify on the matters stated."   Fed R. Civ. P. 65(c)(4).

15   Defendants' evidence regarding the anticipated costs of providing a halal diet with meat

16   is based on the sworn declaration of Keith Smith, Security Operations Administrator for

17   ADC, whose duties include overseeing all aspects of ADC's food services contract with

18   Trinity, including purchasing menus and diets for all ADC inmates, and the affidavit of

19   Laura Donnelly, Regional Dietician for Trinity, whose responsibilities include designing

20   menus for ADC inmates that provide nutritionally adequate meals.   Both Smith and

21   Donnelly attest that their statements are based on personal knowledge.  (Smith Decl. ¶ 1;

22   Donnelly Aff. ¶ 1 (Doc. 135-1 at 33, 38)).  *See Shakur*, 514 F.3d at 889-90 (noting that

23   testimony regarding the costs of procuring prison meals must come from an official with

24   personal knowledge, such as someone who specializes in food service or procurement).

25   Moreover, Smith declares that he communicates regularly with Trinity staff, and his

26   declaration provides specific information about the kinds of halal meat entrees Trinity

27   suppliers could provide and the costs associated with purchasing such entrees.  (Smith

28   Decl. ¶¶ 11-14 (Doc. 135-1 at 34)).  Although Plaintiff appears to seek a more searching

analysis regarding the costs of providing such meals, he does not dispute that Smith and Donnelly are qualified in their respective roles to opine on these matters; nor does he identify any assertions that lack proper authentication or would be unsupported by admissible evidence at trial.

Plaintiff also argues that "Defendant[s] fail to explain why a majority of states and FBOP can accommodate Muslim inmates with [a] halal menu with meat at a cost slightly higher than a standard diet but significantly less[] than a kosher diet with meat." (Doc. 137 at 10-11). But Plaintiff provides no evidence to support that the majority of states and the FBOP provide such meals or that the cost of doing so is roughly commensurate with, or significantly less than, other dietary options. Moreover, Defendants provide evidence that, although not authoritative, tends to refute Plaintiff's claim. Smith declares that, to his knowledge, Trinity "has never contracted to provide a specifically Halal meal for any state's correctional facility, and [] ADC would be the first state correctional facility at which Trinity provided Halal meals, were ADC to engage in such a contract." (Smith Decl. ¶ 12 (Doc. 135-1 at 34)).

Absent sufficient evidence to create a material issue of fact about the estimated increased costs to ADC of providing a halal diet with meat, the Court must now consider whether Defendants have shown that ADC's current meal policy serves a compelling governmental interest. The Court finds that it does. Courts have found that where the record is sufficient to show that providing a particular religious diet would result in significant additional costs to the institution, a prison's need to keep within its budget and to maintain security is a compelling governmental interest. *See Shakur*, 514 F.3d at 889-90 (acknowledging that a prison's considerations of costs and limited resources in light of the need to maintain security is a compelling government interest, but finding insufficient evidence to support costs in that case); *see also Curry v. Cal. Dep't of Corrs.*, C-09-3408 EMC (pr), 2013 WL 75769, at *9 (N.D. Cal. Jan. 4, 2013) (questioning whether a negligible cost increase would constitute a compelling interest, but finding that a $50,000

1    to $60,000 increase per year for a special diet is a compelling interest[3] and collecting

2    cases).

3          Here, the evidence Defendants put forth shows that making a halal diet with meat

4    available to Plaintiff alone—if such a prospect is even possible—would cost ADC up to

5    $7,500.00 more per year, and up to nearly $150,000.00 more over the entire 20 years of

6    Plaintiff's projected incarceration.[4]   According to the statements of Smith and Donnelly,

7    this would not account for the additional costs required to supplement the acquired halal

8    meals with missing nutrients, or the anticipated costs of additional food preparation and

9    storage equipment.   (Smith Decl. ¶ 15; Donnelly Aff. ¶ 6 (Doc. 135-1 at 35, 39-4)).

10   Defendants further show that making halal meals with meat available to all of ADC's

11   Muslim inmates would result in additional expenses of between 7.2 million and 8.4

12   million per year.   Defendants' evidence further supports that the prospect of having to

13   provide a halal diet with meat to all of ADC's Muslim inmates, if it were to make such a

14   diet available to Plaintiff, is not merely speculation.   Defendants present evidence that in

15   2006, when it changed its existing kosher meal plan to a more expensive kosher meal

16   plan that met orthodox kosher requirements, the number of inmates requesting the new

17   kosher diet increased from 57 inmates in 2005 to 425 inmates in 2006—a 700% increase

18   in the first year—which ADC attributes to the perception that the new kosher option was

19   superior in quality to the GP meal.   (Doc. 134 at 9; Linderman Decl. ¶¶ 86-92 (Doc. 135-

20   1 at 12-13)).   In light of the above evidence and ADC's indisputable need to operate

21   within a budget and maintain security, the Court finds that Defendants have met their

---

23   [3] These costs were in the context of an annual food budget of $233 million,
     compared to ADC's annual food budget of $40 million, making the increase that the
24   court in *Curry* found to be an "unreasonable burden on other inmates, prison staff, and
     taxpayers" roughly equivalent, percentage-wise, to the projected increase put forth by
25   Defendants if all of ADC's Muslim inmates were to avail themselves of the halal diet that
     Plaintiff requests.

26   [4] This is based on the evidence that over the course of a year, a halal diet with
     meat would cost ADC $8,714.16 per inmate, compared to $1,227.10 per inmate for a GP
27   or vegetarian diet and $1,976 per inmate for a kosher diet, leading to the conclusion that
     over 20 years' time, a halal diet with meat would total $174,283.20, compared to $24,542
28   for a GP or vegetarian diet and $39,520 for a kosher diet over the same period.   (*See*
     Doc. 134 at 8; DSSOF ¶¶ 110, 111).

- 14 -

1   burden of showing that limiting Plaintiff's religious diet options to a vegetarian diet or a

2   kosher diet with meat serves a compelling governmental interest.

3                    **b.        Least Restrictive Alternative**

4          Defendants maintain that ADC's currently-available diet options also present the

5   least-restrictive alternative for accommodating Plaintiff's religious beliefs.  (Doc. 134 at

6   10-11).  This is because, they argue, Plaintiff can still avail himself of a vegetarian diet

7   that complies with halal standards, or, to the extent that he believes he is required to eat

8   meat, he may do so without entirely violating his professed beliefs under either the

9   kosher or GP diets.  (*Id.*).  Defendants cite to a written response Plaintiff received from

10  the Islamic Services of America ("ISA") addressing Plaintiff's own question "Are

11  Muslims . . . required to eat a vegetarian diet?"  (*Id.* at 11; DSSOF ¶ 34; Doc. 135-1 at

12  31).  IMA's managing director responded, in part, "No, they are not required to eat a

13  vegetarian diet[;] ***nor are they required to eat a meat/poultry diet.***"  (*Id.*) (emphasis

14  added by Defendants in DSSOF ¶ 34).   Defendants further cite IMA's answer to

15  Plaintiff's question, "Must meats eaten by Muslims be slaughtered in accordance to

16  Thabah Slaughter process?"  (*Id.*)  Here, the director responded, "Ideally, yes. . . .

17  However, there are also schools of thought that in a country like the U.S.A. where Halal

18  products are not as prevalent nor readily accessible to all – and at an affordable cost for

19  some – then as long as you recite Bismillah, Allahu, Akbar prior to eating, you may do

20  so."  (*Id.*).  Defendants maintain that in light of this evidence, Plaintiff fails to show what

21  he finds objectionable in the choices currently available to him.  (Doc. 134 at 11).

22         Plaintiff argues that Defendants "ignore[] that [Plaintiff] asserts that he considers

23  eating halal meat something he's required to do."  (Doc. 137 at 10).  He further asserts

24  that under RLUIPA, "a particular religious practice need not be mandated by a religion

25  for a court to find a substantial burden" to an individual plaintiff.  (*Id.*)  Indeed, the Court

26  previously found, as Plaintiff's argument reflects, that the operative question under

27  RLUIPA is whether a plaintiff *personally* has a sincerely-held religious belief, even if

28  that belief is not widely shared.  (*See* Doc. 69 at 7, quoting *Thomas v. Review Bd. of Ind.*

1    *Employment Sec. Div.*, 450 U.S. 707, 715-16 (1981) (The right to religious practice "is

2    not limited to beliefs which are shared by all of the members of a religious sect.")).  In

3    addition, as the Court previously found, whether or not Plaintiff's contention that he must

4    eat meat—and that meat must be halal—is, in fact, rooted in *Plaintiff's* sincerely-held

5    religious beliefs is a triable issue of fact.

6         The Court need not resolve the outstanding factual issues regarding the sincerity of

7    Plaintiff's beliefs and the extent to which ADC's policies burden those beliefs, however,

8    to rule on the evidence put forth by Defendants and to hold that ADC's current religious

9    dietary policy nonetheless offers the least restrictive alternative in this case.  Defendants

10   have put forth evidence, unrefuted by Plaintiff, that providing the halal diet Plaintiff

11   requests is untenable in light of its compelling governmental interest of operating within

12   its budget and maintaining order within its facilities.  Defendants have further put forth a

13   number of alternatives—eating a vegetarian diet that complies with halal standards,

14   eating a kosher diet with meat that has been blessed and slaughtered according to kosher,

15   rather than halal, standards, or eating either a kosher or GP diet with meat and blessing

16   the meat before consumption—that they maintain are the least restrictive ways of

17   accommodating Plaintiff's asserted beliefs.  Even if none of these alternatives satisfies

18   Plaintiff's personal beliefs entirely, as Plaintiff's objection to Defendants' reliance on the

19   IMA's advice suggests, Defendants have shown through their cost analysis that they

20   "actually considered and rejected the efficacy of less restrictive measures" as they were

21   required to do (*Greene v. Solano Cnty. Jail*, 513 F.3d 982, 990 (9th Cir. 2008) (quoting

22   *Warsoldier*, 418 F.3d at 999), and Plaintiff has failed to show any other less restrictive

23   alternatives that ADC has failed to consider.

24        Plaintiff vaguely asserts that "Defendants inadequately responded to the less

25   restrictive policies [Plaintiff] brought to the course of his inmate grievances, including

26   the more permissive policies used by the F.B.O.P., Calif. DOC., and Mass.," but he

27   points to no facts in the record detailing these alleged alternatives, and he cites to no

28   evidence that such alternatives, to the extent that they exist in other jurisdictions, are

achievable by ADC in light of its cost considerations put forth above.  In short, the Court finds that Defendants have carried their burden of showing that ADC's current religious diet options serve a compelling governmental interest, and, though they may each burden the free exercise of Plaintiff's asserted religious beliefs in some substantial way, they nonetheless offer the least restrictive alternatives ADC has for accommodating those beliefs.  The Court will therefore grant summary judgment to Defendants on Plaintiff's RLUIPA claims.

### 2.      First Amendment

To determine whether ADC's religious diet policy violates Plaintiff's free exercise rights under the First Amendment, the Court looks to *Turner*, 482 U.S. 78.  In *Turner*, the U.S. Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  482 U.S. at 89.  The Supreme Court then articulated four factors for courts to consider.  As discussed below, the Court has considered these factors and finds that Defendants are entitled to summary judgment on this claim.

The Court finds that Defendants have satisfied the first *Turner* factor—that there be a valid, rational connection between ADC's religious diet policies and a legitimate governmental interest.  482 U.S. at 89.  As discussed above, Defendants have shown that limiting ADC's religious diet offerings to the currently-existing options is rationally related to operating within its budget, which is unquestionably a legitimate governmental interest.  *Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993).

Evidence on the record also favors Defendants as to the second *Turner* factor— whether there are alternative means of exercising the First Amendment right that remain open to inmates.  482 U.S. at 89.  Plaintiff acknowledges that ADC has registered him according to his Muslim religious preference.  (Doc. 138 ¶ 76).  This allows him to participate in religious gatherings, obtain and possess personal property consistent with the practice of his religion, and receive a religious diet. (DSSOF, ¶ 76).  Defendants also put forth evidence that the available diet options, while they do not fully satisfy

1    Plaintiff's asserted beliefs, allow Plaintiff a vegetarian diet that is in keeping with halal

2    standards, or other options, including a kosher diet and a GP diet containing meats

3    Plaintiff can bless before consumption, that constitute alternative ways of exercising

4    those beliefs.

5          Plaintiff asserts that eating halal meat is not a discretionary religious exercise, but

6    something he is commanded to do.  (Doc. 137 at 10).  He further argues that the

7    alternative put forth in the IMA letter that would allow him to eat non-halal meat "does

8    not reflect the sincerely held religious beliefs of the Pl[aintiff]."  (*Id.* at 6).  But Plaintiff

9    points to no evidence in the record to support his contrary position to the advice he,

10   himself, sought.  In addition, although Plaintiff cites generally to his own grievance, three

11   religious excerpts, and a halal food brochure as evidence that he is "commanded to eat

12   meat[,] and that meat must be halal" (*Id.* at 5; *see* Doc. 112-1 at 35; Doc. 115 at 18-21,

13   27-31, 36-44, 45-46), Plaintiff does not cite to, nor does the Court find, anything in these

14   texts to support his claim that eating meat is mandatory.  Even assuming that Plaintiff's

15   professed need to eat meat is based on personal beliefs that are not fully represented in

16   Plaintiff's proffered documents, the law does not require Defendants to provide every

17   accommodation in the prison context where "[t]he limitations on the exercise of

18   constitutional rights arise both from the fact of incarceration and from valid penological

19   objectives."  (*O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citing *Pell v.*

20   *Procunier*, 417 U.S. 817, 822-23 (1974)).  In *Turner*, the Supreme Court found that

21   "where 'other avenues' remain available for the exercise of the asserted right . . . courts

22   should be conscious of the 'measure of judicial deference owed to corrections officials . .

23   . in gauging the validity of the regulation.'"  482 U.S. at 90, quoting *Jones v. N. Carolina*

24   *Prisoners' Union*, 433 U.S. 119, 131 (1977); *Pell* 417 U.S. at 827.  In light of these

25   considerations and the various religious expressions and dietary options put forth by

26   ADC, the second *Turner* factor weighs in favor of Defendants.

27         The third *Turner* factor—the impact accommodation of the right will have on

28   guards and other inmates, and on the allocation of prison resources—also weighs in favor

of Defendants.  The Supreme Court explained in *Turner* that when accommodation of a particular right "will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials."   482 U.S. at 90.   Here, Defendants put forth evidence that ADC's past accommodations to orthodox Jewish prisoners, in which ADC introduced a more expensive kosher diet, resulted in rapid and significant increases in the number of prisoners requesting kosher diets.  Defendants assert that similar increases in the number of those requesting a halal diet would occur if ADC began providing a halal diet with meat in place of the current vegetarian or non-halal options.  As already discussed, this could result in a potential $7.4 million to $8.2 million increase in ADC's annual food costs, where the entire annual food budget is $40 million.  Defendants argue that even if such a significant spending increase were possible, the resulting shift in resources and staff required to procure and prepare halal meals with meat "would necessarily detract from the care, custody, and control of other inmates and would create a security risk for prison staff."  (Doc. 134 at 14).  Based on the evidence Defendants put forth, the Court has no trouble finding that the resulting impact on ADC's allocation of resources and staff would be significant.  This factor weighs in favor of Defendants.

Finally, the fourth *Turner* factor—the absence of ready alternatives—weighs in favor of Defendants.  482 U.S. at 90.  To satisfy this prong, "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint."  *Id.* at 90-91.  Rather, if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."  *Id.* at 91 (citing *Block v. Rutherford*, 468 U.S. 576, 587 (1984)).  Here, Plaintiff repeatedly insists that only one option adequately accommodates his rights—a fully halal diet that includes meat.  Plaintiff has not shown any evidence, however, that the cost of accommodating this request is *de minimis*.  In light of the evidence put forth by Defendants showing that the cost relative to

1    ADC's entire food budget would, in fact, be substantial, the Court finds that this factor

2    weighs in favor of Defendants.

3           Having found that all four *Turner* factors weigh in favor of Defendants, the Court

4    finds that ADC's current religious diet policy is reasonably related to legitimate

5    penological interests and will therefore grant summary judgment to Defendants on

6    Plaintiff's First Amendment Claim.

7           **C.     Equal Protection Claim**

8           To show a violation under the Equal Protection Clause, a plaintiff must

9    demonstrate that the defendant acted with a discriminatory intent or purpose that was

10   based upon the plaintiff's membership in a protected class, *Serrano*, 345 F.3d at 1082,

11   and he "'must set forth specific facts showing that there is a genuine issue' as to whether

12   he was afforded a reasonable opportunity to pursue his faith as compared to prisoners of

13   other faiths" and that "officials intentionally acted in a discriminatory manner."

14   *Freeman*, 125 F.3d at 737.

15          Here, it is undisputed that Defendants offered a kosher diet with meat to Jewish

16   inmates but did not offer a halal diet with meat to Muslim inmates.  However, Defendants

17   have also put forth undisputed evidence showing that accommodating Plaintiff's request

18   for a halal diet with meat would cost more than four times as much as providing a kosher

19   diet with meat to Jewish inmates.  On this record, and because the Court has already

20   found that ADC's religious diet policy satisfies the reasonableness test under *Turner*, the

21   Court finds that "the difference between the defendants' treatment of [Plaintiff] and their

22   treatment of [other] inmates is 'reasonably related to legitimate penological interests.'"

23   *Shakur*, 514 F.3d at 891; *see also Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997),

24   *overruled on other grounds as stated in Shakur*, 514 F.3d at 884-85 (Prisons need not

25   provide identical accommodations to different faiths, but must make good faith

26   accommodations of the prisoners' rights in light of practical considerations).  The Court

27   will grant summary judgment to Defendants on Plaintiff's equal protection claim.

28   . . .

1          **D.      First Amendment Damages Claim Regarding Shaving Waiver**

2          At issue for purposes of this Order is Plaintiff's First Amendment claim for

3    damages for the seven-month period in which he went without a shaving waiver, from the

4    time of Plaintiff's face-to-face interview with Miser on October 31, 2010, in which

5    Plaintiff requested such a waiver, and May 25, 2011, when Ryan ultimately approved that

6    request.   As set forth above, the majority of Defendants' arguments on this claim are

7    aimed at showing that the time-frame of Plaintiff's grievance process was not

8    inordinately long, and whatever delays that process did entail resulted from Plaintiff's

9    own actions and not from any violations on the parts of Defendants.

10         These arguments miss the mark.   The First Amendment issue for purposes of this

11   claim is not the length of Plaintiff's grievance process.   The issue is whether the initial

12   denial of Plaintiff's shaving waiver, which led Plaintiff to pursue his request through

13   ADC's grievance process, constitutes a violation of Plaintiff's free exercise rights, thus

14   entitling him to damages for the period of time he had to go without this accommodation

15   until it was ultimately approved.

16         Plaintiff asserts that Miser rejected his requests for a religious diet and shaving

17   waiver based solely on Plaintiff's criminal conviction and re-incarceration.   (Doc. 9 at 3-

18   4).   Defendants contest this, arguing, instead, that Miser denied Plaintiff's requests

19   because Plaintiff had failed to articulate a religious reason for making them.   (Doc. 134 at

20   18).   The evidence shows that, following Plaintiff's face-to-face interview with Miser,

21   and the subsequent denial of Plaintiff's requests, Plaintiff filed a formal grievance on

22   December 15, 2010, and received a Grievance Response from Assistant Deputy Warden

23   S. Fay on February 14, 2011.   (Doc. 112-1 at 61).   The Grievance Response informed

24   Plaintiff that Miser was contacted "to investigate your situation," and "[he] advised that

25   he did not know what the sincerity problem was but that he believed because you were

26   released and came back on a new charge (sic).   He states that this shows that you were

27   not consistent in practicing your faith."   (*Id.*).   The Grievance Response additionally

28   refers to Miser's December 1, 2010 Inmate Letter Response to Plaintiff.   (*Id.*, Doc. 9 at

4).  Here, Miser explained to Plaintiff that his request for a religious diet had been denied because,"[b]ased upon an interview with you and a review of available information, this office cannot currently identify a sincere religious reason for your request that is consistent with your religious preference."  (Doc. 55-1 at 10).[5]  Miser's Response went on to say, "If you can provide further information to establish a sincere religious reason for your request[,] it will be reviewed again."[6]

On this record, the Court finds that Plaintiff has put forth sufficient evidence to raise a genuine issue of fact that Miser denied Plaintiff's request for a shaving waiver based solely on his re-incarceration and thereby violated Plaintiff's First Amendment free exercise rights.  As the Court noted in its October 7, 2013 Order, citing *Curry*, 2013 WL 75769, at *7, even non-observance of a professed religious practice, though relevant to the question of sincerity, is not dispositive.  (Doc. 69 at 16).  Plaintiff alleges that Miser questioned the sincerity of his religious beliefs based on Plaintiff's new conviction, which Miser erroneously indicated was for child molestation.  (Doc. 9 at 3).  Plaintiff further points to evidence from Miser's own statements showing he believed this new conviction meant Plaintiff was not consistent in practicing his faith.  Even though Miser wrote to Plaintiff that "this office cannot currently identify a sincere religious reason for your request," this summary explanation does not settle the matter, as Defendants assert.  (Doc. 134 at 18).  A reasonable jury could conclude that Miser based this finding wholly on Plaintiff's new conviction, as Plaintiff's proffered evidence suggests.  Defendants have failed to point to any evidence showing that Miser had additional reasons—such as any known inconsistency in observing the specific religious practices he sought to exercise—for doubting the sincerity of Plaintiff's asserted religious beliefs.

---

[5] The Response refers only to Plaintiff's request for a religious diet, but it pertains to Miser's findings in the face-to-face interview that appear to have been the basis for denying both the religious diet and shaving waiver requests.

[6] These citations are to Miser's Inmate Letter Response submitted as Plaintiff's Exhibit 20.  The reference to this in Fay's February 14, 2011 Grievance Response (Doc. 112-1 at 61) and Plaintiff's quotation of Miser's Response in the First Amended Complaint (Doc. 9 at 4), while substantially accurate, are less complete.

1

### 1.    Qualified Immunity

2     Defendants argue that even if the Court finds that there is sufficient evidence in

3     the record to find that Miser violated Plaintiff's constitutional rights, Miser is entitled to

4     qualified immunity based on "the lack of authority indicating that questioning Nance's

5     sincerity was unconstitutional."  (Doc. 134 at 27).  A defendant in a § 1983 action is

6     entitled to qualified immunity from damages for civil liability if his conduct does not

7     violate clearly established federal statutory or constitutional rights of which a reasonable

8     person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Thus, the

9     "qualified immunity inquiry" asks if the right was clearly established at the relevant time.

10    *Id.* at 201-02.

11    The qualified immunity inquiry "must be undertaken in light of the specific

12    context of the case, not as a broad general proposition."  *Saucier*, 533 U.S. at 201.  The

13    plaintiff has the burden to show that the right was clearly established at the time of the

14    alleged violation.  *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002); *Romero v. Kitsap*

15    *County*, 931 F.2d 624, 627 (9th Cir. 1991).  For qualified immunity purposes, "the

16    contours of the right must be sufficiently clear that at the time the allegedly unlawful act

17    is [under]taken, a reasonable official would understand that what he is doing violates that

18    right;" and "in the light of pre-existing law the unlawfulness must be apparent."

19    *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quotations omitted).  Therefore,

20    regardless of whether the constitutional violation occurred, the officer should prevail if

21    the right asserted by the plaintiff was not "clearly established" or the officer could have

22    reasonably believed that his particular conduct was lawful.  *Romero*, 931 F.2d at 627.

23    The Court finds that Miser is not entitled to qualified immunity.  The issue

24    presented here is not whether questioning Plaintiff's sincerity was unconstitutional, but

25    whether it is a clearly established violation to use an inmate's criminal conviction as the

26    sole basis for discounting the sincerity of his professed religious beliefs, thereby denying

27    him accommodation.  The Court stated in its October 7, 2013 Order that it was unaware

28    of "any authority even suggesting that re-incarceration is, by itself, evidence of

insincerity." (Doc. 69 at 16). The Court additionally cited to *Curry*, 2013 WL 75769, at *7, as finding that even non-observance of a professed religious practice, though relevant to the question of sincerity, is not dispositive. (*Id.*). The Court further stated in the context of Plaintiff's request for a religious diet that it "cannot find that a reasonable prison official would have thought his conduct to be lawful when the [denial was] based on Plaintiff's re-incarceration." (*Id.*). The Court finds support for this position both in *Curry* and in the cases upon which *Curry* relied.

In *Cutter v. Wilkinson*, 544 U.S. 709, 725, n. 13 (2005) the U.S. Supreme Court noted that it was appropriate for prison officials to question the sincerity of an inmate's religious beliefs where prison gangs were suspected of using religious activity to cloak illicit and often violent conduct. Those concerns are not present here, where Plaintiff's request for a shaving waiver has not been connected with any suspected illicit activity. In *McElyea v. Babbit*, the Ninth Circuit found that "[i]t is appropriate for prison authorities to deny a special diet if an inmate is not sincere in his religious beliefs," but it went on to opine that "second-hand knowledge of past behavior" was not "a reasonable method of determining religious commitment" (833 F. 2d 196, 198 (9th Cir. 1987)). In *Lute v. Johnson*, 1:08-cv-00234-EJL, 2012 WL 913749, at *7 (D. Idaho March 16, 2012), the district court affirmed that "'backsliding' or nonobservance of a religious practice is not dispositive" of a professed adherent's religious sincerity, but it found in favor of prison officials who had denied an inmate a kosher diet where the inmate had been known to purchase non-kosher foods before and after his request and therefore to engage in actions that "directly contradict the core of his claim." These cases show that, while it is appropriate to look to an inmate's known behavior as evidence of his or her religious sincerity, it is unreasonable to rely solely on unverified accounts of past actions, particularly where the right sought does not present a known risk and the plaintiff's ostensibly contradictory behavior has little or no connection to the particular accommodation—in this case exemption from prison shaving requirements—he seeks. Because the Court finds that a reasonable jury could conclude that Miser violated

1   Plaintiff's free exercise rights by using his conviction as the sole basis for denying him a

2   shaving waiver, and Miser is not entitled to qualified immunity on that claim, the Court

3   will deny summary judgment to Defendants on Plaintiff's First Amendment claim for

4   damages against Miser.

5                    **2.    Remaining Defendants**

6           The Court will grant summary judgment to Defendants as to the remaining three

7   Defendants because Plaintiff fails to show that any of them violated Plaintiff's free

8   exercise rights with respect to his request for a shaving waiver.

9                         **a.    Vicklund**

10          Plaintiff's claim against Vicklund is based primarily on Vicklund's alleged failure

11  as Miser's supervisor to respond to Plaintiff's grievances about Miser's "discriminatory

12  comment."  Doc. 9 at 6.  This alleged violation does not directly pertain to the denial of

13  the shaving waiver at issue.  Moreover, even if it did, to the extent that Plaintiff attempts

14  to hold Vicklund liable for the actions of a subordinate, this is not a proper § 1983 claim.

15  There is no *respondeat superior* liability under § 1983, and therefore, a defendant's

16  position as the supervisor of persons who allegedly violated Plaintiff's constitutional

17  rights does not impose liability.  *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S.

18  658, 691-92 (1978); *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992); *Taylor v.

19  List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

20          Plaintiff does not point to any other actions of Vicklund that relate to the denial of

21  a shaving waiver or that otherwise show that Vicklund, through his own actions, violated

22  Plaintiff's free exercise rights.  *See Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009) ("a

23  plaintiff must plead that each Government-official defendant, through the official's own

24  individual actions, has violated the Constitution.").  Accordingly, the Court will grant

25  summary judgment to Vicklund and dismiss him from this action.

26                         **b.    Linderman**

27          Plaintiff also does not show that Linderman had any direct role in the denial of

28  Plaintiff's shaving waiver.  He alleges that Linderman responded to an inmate letter that

1    Plaintiff sent on February 11, 2011 "regarding Islamic representation, consultation, and
2    denial of religious diet" by informing Plaintiff that "there is a process by which you can
3    have your concern addressed," and asking him to "follow the process." (*Id.* at 8). But
4    even if Plaintiff's request had some relationship to his seeking a shaving waiver, he does
5    not show that Linderman had any role in denying that request or that asking Plaintiff to
6    "follow the process" kept him from pursuing his rights. Plaintiff's remaining allegations
7    against Linderman concern Plaintiff's continued insistence that he receive a halal diet
8    after Ryan and Linderman had already upheld his request for a religious diet and shaving
9    waiver and are not relevant here. Accordingly, the Court will grant summary judgment to
10   Defendants as to Vicklund and will dismiss him from this action.

11                                    **c.      Patton**

12          Plaintiff's claim against Patton is based only on Patton's alleged statements
13   regarding Plaintiff's dietary options after he had been granted a religious diet (Doc. 9
14   at 9) and are not relevant to any delays in Plaintiff receiving a shaving waiver.
15   Accordingly, the Court will grant summary judgment to Defendants as to Patton and will
16   dismiss him from this action.

17   **IT IS ORDERED:**

18          (1)     The reference to the Magistrate Judge is withdrawn as to Defendants'
19   Renewed Motion for Summary Judgment (Doc. 134) and Defendants' Motions to Strike
20   (Docs. 141, 142);

21          (2)     Defendants' Motion to Strike (Doc. 141) is **denied as moot**, and
22   Defendants Amended Motion to Strike (Doc. 142) is **granted in part** and **denied in part**
23   as forth in this Order;

24          (3)     The Clerk of Court is instructed to **strike** Plaintiff's Notice (Doc. 139) and
25   Plaintiff's duplicate attachments (Doc. 138-1).

26          (4)     Defendants' Renewed Motion for Summary Judgment (Doc. 134) is
27   **granted in part** and **denied in part** as set forth in this Order.

28

(5)     Plaintiff's claims for damages and injunctive relief under RLUIPA, the First Amendment, and the Equal Protection Clause regarding a halal diet with meat are **dismissed**;

(6)     Defendants Vicklund, Linderman, and Patton are **dismissed**;

(7)     Plaintiff's remaining claim is a First Amendment claim for damages against Miser for denial of a shaving waiver for 7 months.

DATED this 16th day of June, 2015.

Honorable Stephen M. McNamee
Senior United States District Judge